This appeal originates from a complaint for divorce filed by Danne Dunn on January 10, 1991, in the Jackson County Chancery Court. She requested custody of the children and child support, permanent alimony, a vehicle with tag and insurance, use and possession of the homestead along with its furnishings and fixtures, and attorneys fees. Danne later amended her complaint to request an equitable lien on Michael Dunn's business.
Following a trial on the matter the chancellor entered his final judgment which granted divorce on the grounds of adultery. Danne was awarded custody, child support, a lien against Michael's business and his *Page 1279 
interest in a commercial lot owned jointly by the parties, exclusive use and possession of the homestead, two thousand five hundred dollars ($2,500.00) in attorneys fees, an equitable lien on Michael's interest in the homestead, repayment of a $20,000.00 debt from the business, and use and possession of an automobile. Michael subsequently perfected an appeal to this Court, for a determination of the following issues:
1. Did the trial court err in granting Appellee a $20,000.00 equitable interest in the homestead?
2. Did the trial court err in awarding Appellee a $20,000.00 monetary interest against Appellant's business?
3. Did the trial court err by ordering Appellant to pay the $1,500.00 monthly house note and weekly child support in the amount of $130.00 per week for two children?
4. Did the trial court err by enjoining Appellant from having his children in the presence of his lover? and
5. Did the trial court err in ordering Appellant to pay the sum of $2,500.00 to Appellee for attorney fees?
 MOTION PASSED FOR CONSIDERATION
Appellee filed a motion to strike the reply brief of Appellant which was passed for consideration with this appeal. After a thorough reading of the record and examination of this reply brief, we find that only one paragraph goes beyond the record. Although having no bearing on this appeal, this portion of the Appellant's reply brief is stricken as it attempted to augment the record in violation of Supreme Court Rule 10(f).
 THE FACTS
Mike and Danne Dunn were married in Jackson County, Mississippi, in September, 1981. Danne was employed by Singing River Hospital, where she remained at the time of trial. Mike was a salesman at Jeff Coat Motors. Each party had been married previously, Mike's first marriage having ended in divorce and Danne's with the death of her husband. Mike had two children from his previous marriage who were 18 and 20 years old at the time of the trial below. The marriage of Mike and Danne produced two children who were 8 and 4 years old at the time this original case was heard.
In March of 1981, prior to marrying Danne, Mike received from his father eight lots in Belle Fontaine Beach. In exchange for this land Mike assumed a mortgage of his father's which did not pertain to the lots. At the time of the exchange there were eleven (11) remaining payments of one thousand dollars ($1,000.00) each which Mike began paying in either March or April of that year. Mike also owned a piece of waterfront property in Gautier which he sold in July, 1980, for twenty-six thousand dollars ($26,000.00). At the time this land was sold, Mike owed approximately six thousand dollars ($6,000.00) on it. A Corvette Mike owned prior to his marriage to Danne was also sold pre-nuptially for about ten thousand dollars ($10,000.00). Other assets Mike brought to the marriage were some furnishings and somewhere between five and ten thousand dollars ($5,000.00-$10,000.00) cash other than from the sale of the items mentioned previously.
Danne brought to the marriage her own automobile and furnishings from a two bedroom apartment, all of which she owned free and clear. She also had approximately twenty thousand dollars ($20,000.00) in certificates of deposit (the remainder of her first husband's insurance policy proceeds) and thirty-five hundred to four thousand dollars ($3,500.00-$4,000.00) in a credit union account.
About half of the one thousand dollar ($1,000.00) monthly notes which Mike assumed in exchange for the land from his father were remaining at the time Mike and Danne married. These remaining notes were paid out of the Dunns' joint checking account. After the lots were paid for Mike sold two of them for five thousand four hundred dollars ($5,400.00). This amount went toward the expense of building the couple's house. The Dunns' home was built on the remaining six lots and the *Page 1280 
land was conveyed to allow Mike and Danne to own as joint tenants. Mike estimates the value of the land at the time he transferred it to him and Danne as joint tenants was between twenty-two and twenty-three thousand dollars ($22,000.00-$23,000.00)
Shortly after Mike and Danne married they bought a trailer and put it on the six lots Mike still owned which were originally his father's. Mike testified that he paid for the trailer with the proceeds from the sale of the Corvette. The couple lived in this trailer while they built a house on the same land. When the trailer was sold in February, 1983, for seven thousand nine hundred dollars ($7,900.00), the money went into the house, according to Mike.
Other funds for the house came from a variety of sources. Danne contributed her twenty thousand dollars ($20,000.00) as well as three thousand six hundred dollars ($3,600.00) from her credit union account (or checking account) and two or three hundred dollars ($200.00 or $300.00) from her checking account and Mike claims that he contributed an equal sum which was the money he received from the sale of the land in Gautier. He later stated that the money he contributed to the house also came from the sale of the Corvette. Danne disputed this and said Mike only contributed about ten thousand dollars ($10,000.00).
Income earned by Mike and Danne was put into a joint checking account from which the couple wrote checks to pay for items associated with building the house. The couple had also arranged a loan for forty thousand dollars ($40,000.00) through an individual named Jessie Williams. A log book kept by Mike but in possession of Danne at the time of this trial showed that a total of seventy-three thousand dollars ($73,000.00) was spent on the house, although Mike says that figure does not include "finishings." The couple then had a seven (7) year mortgage which they paid off via monthly notes of seven hundred six dollars and eleven cents ($706.11) which were paid out of their joint checking account.
After being employed at Jeff Coat Motors for many years, Mike decided to go into business for himself in 1984 and started Mike Dunn Auto Sales, a sole proprietorship. The business was located on property which Mike rented from Sid Hackler for five hundred dollars ($500.00) a month. Mike testified that he borrowed money from Sid Hackler and put about ten thousand dollars ($10,000.00) of his own money (from the sale of the Corvette) into start up costs. Danne testified that Mike asked her to borrow two thousand dollars ($2,000.00) from her credit union, which she did, and put it into the business. This amount has since been paid back through payroll deductions from Danne's checks. (At another point during the trial Danne stated that this money went into the house rather than the business.)
In late 1984 or 1985 Mike and Danne, using their homestead as collateral, obtained a fifty thousand dollar ($50,000.00) line of credit to enable Mike to increase his inventory at the car lot and, according to Mike, to pay for additional things at the house. Within a year, thirty thousand dollars ($30,000.00) had been spent. According to Mike, five thousand dollars ($5,000.00) went to build a deck at the Dunns' home and the remainder went to inventory at Mike Dunn Auto Sales. Over the next two years the amount spent had risen to the entire fifty thousand dollars ($50,000.00). Mike was unable to say what amount of the last twenty thousand dollars ($20,000.00) went to the business and what amount went to the marital home. Danne denies that any of the fifty thousand dollars went into the home.
In the early days of Mike Dunn Auto Sales, Danne helped Mike get started. In addition to working full time at Singing River she performed some work for Mike at the car lot and also worked for the business at home for ten to fifteen hours a week in the first months. After that time she continued to work about five or six hours a week at home for Mike Dunn Auto Sales until 1986, after the birth of their second child. *Page 1281 
In contemplation of building his own facility for Mike Dunn Auto Sales, the Dunns purchased a commercial lot in 1987 in the names of Mike and Danne Dunn for fifty thousand dollars ($50,000.00). A ten thousand dollar ($10,000.00) down payment was made by Mike Dunn Auto Sales and the remaining forty thousand dollar ($40,000.00) balance was financed. Mike Dunn Auto Sales paid the balance down to thirty thousand dollars ($30,000.00); then this balance was consolidated with the fifty thousand dollars ($50,000.00) owed from the line of credit, for which the homestead had been used as collateral. As business took a turn for the worse, Mike never built on this land and at the time of trial had a "for sale" sign on the property which had been up for about seven months. Mike valued the property at about thirty-five thousand dollars ($35,000.00) as of the time of trial. Taxes on the lot were about fifty-five dollars ($55.00) a month.
The balance of the note which encumbered the homestead at the time of the trial was a little less than seventy-four thousand dollars ($74,000.00). The payments on this balance were made by Mike Dunn Auto Sales in the amount of one thousand five hundred dollars ($1,500.00) a month. Mike referred to this amount as the "house note" but Danne denied that any of that debt went toward their house. Insurance and taxes on the house were not included in this note. Insurance was about twelve hundred dollars ($1,200.00) a year and taxes were seventy-seven dollars ($77.00) a month.
When the house was used as collateral for the line of credit in 1984 it was appraised at one hundred twenty-five thousand dollars ($125,000.00). Since that appraisal, the five thousand dollar ($5,000.00) deck and a ten thousand dollar ($10,000.00) addition had been added. Money for the addition, according to Mike, came from Mike Dunn Auto Sales but the checks were written from his and Danne's joint checking account.
Early in the marriage Danne's car was sold by Mike Dunn Auto Sales. Danne remembers the price being six or seven thousand dollars ($6,000.00 or $7,000.00) while Mike testified that it was about three thousand dollars ($3,000.00). Mike does not remember what he did with the proceeds. Danne testified that the proceeds from the sale of her car went into Mike Dunn Auto Sales. Since that time both Danne and Mike have used vehicles from the car lot inventory, with dealer tags, for their personal use. The vehicles used for the Dunns' personal use were insured through Mike Dunn Auto Sales. Maintenance and gas, for the most part, were also paid for by the car business.
In 1988 Mike joined a hunting club which consisted of ten members, each of whom spent eighteen hundred dollars ($1,800.00) to purchase an individual's second mortgage on some land in Brunell, Mississippi. Annual assessments for the club were about two hundred dollars ($200.00).
Mike and Danne's daughter, Ashley, who was eight years old at the time of trial, attended Magnolia Park and attended dancing school once a week. Matthew, the four year old, attended Saint Paul's pre-kindergarten at a cost of one hundred dollars ($100.00) a month. Child care for Matthew and for Ashley after school averaged two hundred forty dollars ($240.00) a month but was eighty dollars ($80.00) a week when school was out in the summer. All family members were in good health but Ashley was undergoing orthodontia.
Danne claimed that insurance and car tag would cost her about eighty-five dollars ($85.00) a month and gasoline would be about eighty dollars ($80.00) a month. Other household expenses as estimated by Danne are: electricity — eighty dollars ($80.00) a month, telephone — seventy dollars ($70.00) a month, cable — thirty-two dollars ($32.00) a month, food — three to four hundred dollars ($300.00-$400.00) a month. She estimated a total of one thousand six hundred thirty-eight ($1,638.00) for monthly expenses. Danne testified that the couple always paid cash for everything they bought for the house. Medical insurance for the family, including Mike's two children from his first marriage, was provided through Danne's employer at a cost of *Page 1282 
sixty dollars ($60.00) a month which was deducted from Danne's paycheck. The divorce made Mike and his two grown children ineligible for this coverage. Mike estimated that the cost of insuring his two children from the previous marriage would be sixty-six dollars ($66.00) a month.
Mike had about a year and a half of college. He testified that used car sales had been going downhill for about two or three years prior to the trial. Mike received no set income from the car lot; instead he wrote himself checks as needed. Danne testified that Mike had told her about car deals in the past which allowed him to pocket some cash. Danne estimated that he deposited about one thousand dollars ($1,000.00) a month into their joint checking account and she contributed about nine hundred ($900.00). According to his 1990 tax return, Mike's adjusted gross income for the year was twenty-nine thousand fifty-four dollars ($29,054.00). The amount of gross sales at Mike Dunn Auto Sales for that year was six hundred seven thousand six hundred eighty-five dollars ($607,685.00) and Mike's net income was thirty thousand five hundred forty-seven dollars ($30,547.00). At the time of trial the car lot had ninety thousand dollars ($90,000.00) in inventory. Mike has an IRA in the amount of two thousand nine hundred dollars ($2,900.00) which was funded through Mike Dunn Auto Sales.
Danne had an associate degree and some additional college. She was currently employed by Singing River Hospital where she earned, at the time of this trial, $13.39 an hour. Her tax returns for 1990 showed an income of twenty-eight thousand five hundred sixty-seven dollars ($28,567.00), which included overtime, bonuses, and sick leave rebate. Her monthly gross income was two thousand four hundred dollars ($2,400.00) Since the separation Danne had excluded all credit union deductions and netted six hundred twenty or thirty dollars ($620.00 or $630.00) every two weeks.
As each child was born, Danne began a savings account for him/her through payroll deductions with her employer. Ashley's account had about two thousand dollars ($2,000.00) at the time of the trial and Matthew's account had about eight hundred dollars ($800.00). Danne's paycheck always went into her and Mike's joint checking account, out of which monthly expenses were paid. Danne also had an account for herself (which also had Mike's name on it until the time of their separation) with a balance of one thousand six hundred dollars ($1,600.00) as of May, 1991, and she participated in Singing River's mandatory retirement system. She was vested in the retirement account and could get out exactly what she had contributed ($13,250.00 at the time of trial) if she were to terminate before attaining thirty years of service. If not withdrawn until after thirty years with the hospital or if she were not to quit until she were sixty-two years old, the hospital would match her funds dollar for dollar. Danne also has an IRA in the amount of two thousand nine hundred dollars ($2,900.00) which was funded by Mike Dunn Auto Sales. The only outstanding bills at the time of the trial were a McRae's charge card balance of six hundred dollars ($600.00) which had been spent on Christmas gifts and clothes for the entire family, including the two children from Mike's previous marriage, and back taxes.
Because Mike admitted to an adulterous affair with a former employee of his, the divorce was granted as requested on the grounds of adultery. Danne was clearly granted a divorce on the grounds of adultery, custody of the minor children, child support to be paid by Michael, exclusive use and possession of the homestead, twenty thousand dollars ($20,000.00) to be paid by Mike Dunn Auto Sales, and attorney fees. Less clear is what the chancellor intended regarding the numerous liens mentioned in the judgment. It appears that Danne was granted a lien in the amount of twenty thousand dollars ($20,000.00) in Michael's interest in the homestead to secure payment of the twenty thousand dollars ($20,000.00) the chancellor found was owed her by Mike Dunn Auto Sales. It further appears that Danne was granted an additional lien in the amount of twenty thousand dollars ($20,000.00) on Michael's interests in the commercial lot and *Page 1283 
in Mike Dunn Auto Sales to secure payment of the note under the terms of which the homestead is encumbered, payment of child support, and payment of the twenty thousand dollars ($20,000.00) from Mike Dunn Auto Sales. Discussion of the issues presented is grounded on this premise. In order to facilitate our discussion of the issues on appeal, they are not necessarily addressed in the order in which they were presented.
 THE LAW I.
DID THE TRIAL COURT ERR IN AWARDING THE APPELLEE A $20,000.00 MONETARY INTEREST AGAINST THE APPELLANT'S BUSINESS?
"On appeal this Court will not reverse a Chancery Court's findings, be they of ultimate fact or of evidentiary fact, where there is substantial evidence supporting those findings." Cooperv. Crabb, 587 So.2d 236, 239 (Miss. 1991), citing Mullins v.Ratcliff, 515 So.2d 1183, 1189 (Miss. 1987); Norris v. Norris,498 So.2d 809, 814 (Miss. 1986); Gilchrist Machinery Co., Inc.v. Ross, 493 So.2d 1288, 1292 (Miss. 1986). "Unless the Chancellor's determination of fact is manifestly wrong, this Court will uphold his decision." Cheeks v. Herrington,523 So.2d 1033, 1035 (Miss. 1988), citing Dillon v. Dillon,498 So.2d 328, 329 (Miss. 1986); Dubois v. Dubois, 275 So.2d 100
(Miss. 1973).
The chancellor found that Mike Dunn Auto Sales owed Danne twenty thousand dollars ($20,000.00) for the money and labor she had supplied. Danne did substantially help in creating Michael's successful business. When Michael started his business in 1984 Danne helped set up files and the telephone list, working approximately ten to fifteen hours a week in the first months and then five or six hours a week until the birth of the couple's second child in 1986. All the while Danne continued working full time at Singing River. Danne also testified that she contributed two thousand dollars ($2,000.00) which she borrowed through her credit union and which has since been repaid through payroll deductions. Although Michael did not recall this he did not dispute it either. The automobile Danne owned at the time the couple were married was sold and the proceeds, which Danne claimed were six or seven thousand dollars while Michael claimed were three thousand dollars, were put into the business, according to Danne. Again, Michael does not recall what was done with the proceeds. The chancellor specifically mentioned a thirty-five hundred dollar ($3,500.00) credit union account going toward the business, which, as Michael correctly pointed out in his brief, actually went into the home. However, due to financing arrangements subsequently obtained, this amount along with Danne's more than twenty thousand dollars plus her labor on the house ultimately helped Michael's business too.
Danne has clearly contributed to Mike Dunn Auto Sales, both directly and indirectly. Had Danne invested her time and money in something other than Mike Dunn Auto Sales, she would have cash in hand today. Instead, Michael has Mike Dunn Auto Sales and she has nothing to show for her investment. The chancellor's finding that Mike Dunn Auto Sales owes Danne $20,000.00 is supported by the record and will not be disturbed.
 II.
DID THE TRIAL COURT ERR IN GRANTING THE APPELLEE A $20,000.00 EQUITABLE INTEREST IN THE HOMESTEAD?
Again we review a finding of fact made by the chancellor and again our scope of review is limited. It appears that the chancellor granted Danne a twenty thousand dollar ($20,000.00) equitable interest in Mike's interest in the homestead, which is titled in both Michael and Danne's names as joint tenants, to secure payment of the $20,000.00 debt owed to Danne from Mike Dunn Auto Sales.
Much was made at trial of the cash that always seemed available to Michael Dunn, *Page 1284 
his inability to say where it came from or where it was kept, the savings accounts which he controlled although in the names of his children from his first marriage, and the business deals of Mike Dunn Auto which allowed Michael to pocket cash. This was not lost on the chancellor, who stated that the way Michael ran his business "raise[d] a question as to whether he would be deceptive in his financial representations to his wife." The chancellor clearly determined that an equitable lien was necessary to protect Danne and insure payment of the twenty thousand dollars ($20,000.00) by Mike Dunn Auto Sales.
There is substantial evidence in the record to support this finding of the chancellor and he has the authority necessary to impose such a lien. See Mississippi Code Annotated § 93-5-23
(Supp. 1991). We affirm the chancellor's order concerning the $20,000.00 lien against Michael's interest in the homestead to secure payment of the $20,000.00 debt owed Danne from Mike Dunn Auto Sales.
 III.
DID THE TRIAL COURT ERR BY ORDERING THE APPELLANT TO PAY THE $1,500.00 MONTHLY HOUSE NOTE AND WEEKLY CHILD SUPPORT IN THE AMOUNT OF $130.00 PER WEEK FOR TWO CHILDREN?
This Court does not sit to redetermine questions of fact.Johnson v. Black, 469 So.2d 88, 90 (Miss. 1985). When substantial evidence supports the findings of the Chancellor we will not disturb his conclusions, notwithstanding that we might have found otherwise as an original matter. Jim Murphy Associates, Inc. v. LeBleu, 511 So.2d 886, 894 (Miss. 1987),affirmed 557 So.2d 526 (Miss. 1990).
 A. The Monthly Note
First, Michael mischaracterizes the note by referring to it as the "house note." The terms of the note do indeed encumber the house but to look no further and call this a "house note" would be to ignore many important facts surrounding this financial transaction.
As stated earlier, the parties both put monies of their own into the house and performed some of the labor. Some items connected with building the home were paid for out of the Dunns' joint checking account. In addition, a forty thousand dollar ($40,000.00) loan was obtained. However, the couple paid off this loan in seven years.
In 1984 Michael obtained a line of credit which was secured by the house. Over the course of three years the balance on this line of credit was fifty thousand dollars ($50,000.00). Michael testified that at least five thousand dollars ($5,000.00) of this balance went into the home. Danne disputed this and said all of the fifty thousand dollars ($50,000.00) went into Mike Dunn Auto Sales.
Subsequent to obtaining the line of credit, a commercial lot was purchased with the intent of building a new facility for Mike Dunn Auto Sales. Once the loan on the commercial lot, which was purchased in the names of both parties for fifty thousand dollars ($50,000.00), had been paid down to a balance of thirty thousand dollars ($30,000.00) by Mike Dunn Auto Sales, it was consolidated with the fifty thousand dollar ($50,000.00) debt from the line of credit.
The fifteen hundred dollar ($1,500.00) monthly payments, which Michael calls the house note, are actually paying off the fifty thousand dollar line of credit, most of which (arguably all of which) was used to increase the inventory of Mike Dunn Auto Sales, and the commercial lot which was purchased for Mike Dunn Auto Sales. These payments had consistently been made by Mike Dunn Auto Sales and at the time of the trial the balance due was just under seventy-four thousand dollars ($74,000.00).
The chancellor ordered that the commercial lot, owned jointly by Michael and Danne, be sold and the proceeds applied to this consolidated debt. When the remainder of this debt is paid, Michael, as sole proprietor, will still have Mike Dunn Auto Sales, the entity which gained the most *Page 1285 
(and quite possibly the only entity which benefitted) as a result of this debt.
Michael's argument that this payment is a form of alimony is without merit. There is substantial evidence to support the chancellor's finding that Michael should pay the fifteen hundred dollar ($1,500.00) monthly note and we affirm his finding.
 B. Child Support
An award of child support is within the chancellor's discretion and will not be disturbed by this Court unless the chancellor was manifestly in error in his finding of fact and manifestly abused his discretion. Smith v. Smith, 585 So.2d 750, 753 (Miss. 1991); Powers v. Powers, 568 So.2d 255, 257-58 (Miss. 1990).See also Miss. Code Ann. § 93-5-23 (Supp. 1992).
Although we have child support award guidelines in our Code [Miss. Code Ann. § 43-19-101 et seq. (Supp. 1992)], they are mere guidelines and do not control the chancellor's award of child support. Hammett v. Woods, 602 So.2d 825 (Miss. 1992); Greggv. Montgomery, 587 So.2d 928, 932-33 (Miss. 1991); Thurman v.Thurman, 559 So.2d 1014, 1017-18 (Miss. 1990). See also Jellencv. Jellenc, 567 So.2d 847 (Miss. 1990). The rebuttable presumption of the appropriateness of an award pursuant to these guidelines may be overcome by an award that does not comply with the guidelines or by making a written finding on the record that the application of the guidelines would be unjust or inappropriate in a particular case. Thurman, 559 So.2d at 1017; Miss. Code Ann. § 43-19-103 (Supp. 1991). Where the adjusted gross income of the payor is more than fifty thousand dollars ($50,000.00) or less than five thousand dollars ($5,000.00) annually, the chancellor is instructed to make a written finding of whether application of the guidelines is reasonable. Miss. Code Ann. § 43-19-101(4) (Supp. 1992).
 When entering a child support decree, the chancellor should consider all circumstances relevant to the needs of the children and the capacities of the parents. The reasonable needs of the children are obviously the beginning point in such inquiry. There is always some minimum level of food, clothing, shelter, day care, education, medical care and the like that must be provided. Above that, what is reasonable turns on the circumstances — and one of the major circumstances is the financial resources reasonably available to each parent.
Dudley v. Light, 586 So.2d 155, 162 (Miss. 1991), quotingTedford v. Dempsey, 437 So.2d 410, 422 (Miss. 1983).
The chancellor rebutted the presumption that an award pursuant to the guidelines was appropriate by awarding an amount of child support that does not comply with the guidelines. Although not binding, the guidelines set out in § 43-19-101 are helpful in determining whether the chancellor was manifestly in error in his finding of fact.
Michael's adjusted gross income, figured pursuant to Miss. Code Ann. § 43-19-101(3) (Supp. 1992), is twenty-one thousand seven hundred thirty-one dollars ($21,731.00) annually. This does not include a reduction for the cost of supporting his children from the previous marriage as there is no evidence Michael is subject to an existing court order for their support; custody is in their mother; he claimed neither of these children on his taxes; and although Michael claims he will spend nine thousand dollars ($9,000.00) a year for his grown son's tuition he specifically stated that he did not claim this son for tax purposes in order that his son might obtain a grant. See Miss. Code Ann. §43-19-101(3)(c) and (d) (Supp. 1992).
Michael's monthly adjusted gross income according to these calculations is one thousand eight hundred ten dollars ($1,810.00). Pursuant to the guidelines, support for two children should be twenty percent (20%) of the adjusted gross income or three hundred sixty-two dollars ($362.00) a month in this instance. The chancellor ordered Michael to pay one hundred thirty dollars ($130.00) a week, which is five hundred twenty dollars ($520.00) a month based on a four week month.
The difference between the statutory twenty percent and the amount awarded by *Page 1286 
the chancellor is fairly substantial. Additionally, Michael is required to pay one-half of any medical costs for the children which are not covered by insurance. According to the figures submitted on the financial declarations, even after subtracting the business expenses Michael listed and the college tuition for his grown son, but adding his current rent, Michael's expenses exceed his net income by almost two hundred fifty dollars ($250.00) a month. Danne does not fare any better. After subtracting the expenses Michael has been ordered to pay, her monthly expenses exceed her net income by three hundred dollars ($300.00).
Though there are probably expenses listed by each party which could be reduced or done away with entirely, support of these two households will not be easy on the incomes reported. Payment of the amount of child support awarded is impossible based on the figures presented. In light of the financial resources apparently reasonably available, the chancellor erred. We therefore reverse and remand for a new hearing on the issue of child support.
 IV.
DID THE TRIAL COURT ERR BY ENJOINING THE APPELLANT FROM HAVING HIS CHILDREN IN THE PRESENCE OF HIS LOVER? Visitation and restrictions placed upon it are within the discretion of the chancery court. Newsom v. Newsom, 557 So.2d 511, 517 (Miss. 1990); Clark v. Myrick, 523 So.2d 79, 83 (Miss. 1988); Cheek v. Ricker, 431 So.2d 1139, 1146 (Miss. 1983). Visitation should be set up with the best interests of the children as the paramount consideration, keeping in mind the rights of the non-custodial parent and the objective that parent and child should have as close and loving a relationship as possible, despite the fact that they may not live in the same house. Clark, 523 So.2d at 83; Cox v. Moulds, 490 So.2d 866, 870 (Miss. 1986).
White v. Thompson, 569 So.2d 1181, 1185 (Miss. 1990). In Cox,
this Court found that in order for a chancellor to restrict visitation he would have to find "something approaching actual danger or other substantial detriment to the children." Id. at 868. This Court in Newsom held that the chancery court could restrict visitation in circumstances which present "an appreciable danger of hazard cognizable in our law." Id. at 517.
There was no evidence presented that visitation in the mere presence of a lover of Michael's would be detrimental to the children or dangerous in any way. Discussing standards to follow in custody modifications, in Morrow v. Morrow, 591 So.2d 829, 833 (Miss. 1991), we stated:
 [a]n extramarital relationship is not, per se, an adverse circumstance. Ballard [v. Ballard], 434 So.2d [1357] at 1360 [Miss. 1983] defined the inquiry as ensuring against harm to the child, noting parenthetically, "whether such [parental] behavior is immoral or not. . . ." See also Kavanaugh v. Carraway, 435 So.2d 697 (Miss. 1983).
Absent any evidence that visitation with Michael and his lover would be harmful to the children, the chancellor erred and abused his discretion in placing such a restriction on Michael's visitation. We must reverse the chancellor's decision on this issue and remand to the Chancery Court of Jackson county for a determination not inconsistent with this opinion.
 V.
DID THE TRIAL COURT ERR IN ORDERING THE APPELLANT TO PAY THE SUM OF $2,500.00 TO THE APPELLEE FOR ATTORNEY FEES?
The award of attorney fees in divorce cases is left to the discretion of the chancellor, assuming he follows the appropriate standards. Adams v. Adams, 591 So.2d 431, 435 (Miss. 1991), citing Cheatham v. Cheatham, 537 So.2d 435, 440 (Miss. 1988). The fee should be fair and should only compensate for services actually rendered after it has been determined that the legal work charged for was reasonably required and necessary. Adams, *Page 1287 
591 So.2d at 435, quoting McKee v. McKee, 418 So.2d 764, 767 (Miss. 1982). Unless the chancellor is manifestly wrong, his decision regarding attorney fees will not be disturbed on appeal.Trunzler v. Trunzler, 431 So.2d 1115, 1116 (Miss. 1983).
Generally, unless the party requesting attorney fees can establish the inability to pay, such fees should not be awarded.Jones v. Starr, 586 So.2d 788, 792 (Miss. 1991); Martin v.Martin, 566 So.2d 704, 707 (Miss. 1990). There are exceptional circumstances, not evident here, which warrant an award of attorney fees although neither party is unable to pay. O'Neillv. O'Neill, 501 So.2d 1117, 1119 (Miss. 1987) (litigation calculated to harass). And in Adams, this Court allowed an award of a portion of the wife's attorney fees where she was before the court because of her husband's appeal, she was largely successful in defending the original decree, she had investments of $110,000.00 and an income of $14,000.00 and testified that she would eventually be able to pay her own fees.
In this case Danne is before the Court because of Michael's appeal and has succeeded in defending a portion of the original decree. Other than her $2,900.00 IRA and her $1,600.00 savings, Danne has no investments to invade in order to pay her attorney. Rather, there was evidence presented that Danne does not have the ability to pay her attorney fees in full. Based on her income and expenses, even partial payments on a monthly basis would be an impossible burden.
Danne's attorney estimated that his final fee would be $3,900.00, of which $550.00 has been paid. The chancellor ordered Michael to pay $2,500.00 of Danne's attorney fees. It does not appear that the Chancellor was manifestly wrong and his decision on this issue is hereby affirmed.
The chancellor's order that Michael's business owes Danne $20,000.00 and the equitable lien in that amount against Michael's interest in the homestead to secure such payment is affirmed. The chancellor's determination that Michael pay the monthly note on the consolidated debt and a portion of Danne's attorney fees is affirmed. We reverse and remand for a new hearing for determination of an appropriate amount of child support and for a proper determination of Michael's visitation rights.
AFFIRMED IN PART; REVERSED AND REMANDED TO THE CHANCERY COURT OF JACKSON COUNTY FOR PROPER DETERMINATION OF CHILD SUPPORT AND VISITATION.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, PITTMAN, BANKS, McRAE and ROBERTS, JJ., concur.