# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 1998-CA-01309-SCT

*DONNA ROGERS a/k/a DONNA LYNN MORIN*

*v.*

**MARK MORIN**

| | |
|---|---|
| DATE OF JUDGMENT: | 07/22/1998 |
| TRIAL JUDGE: | HON. H. DAVID CLARK, II |
| COURT FROM WHICH APPEALED: | SCOTT COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | DANNYE L. HUNTER |
| | THOMAS QUITMAN BRAME, JR. |
| ATTORNEY FOR APPELLEE: | WILLIAM CHARLES BELL |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 05/10/2001 |
| MOTION FOR REHEARING FILED: | 6/8/2001; denied 8/23/2001 |
| MANDATE ISSUED: | 8/30/2001; amended to impose penalty pursuant to Miss. Code Ann. Section 11-3-23 9/13/2001 |

### BEFORE BANKS, P.J., SMITH AND WALLER, JJ.

### SMITH, JUSTICE, FOR THE COURT:

¶1. This case comes to this Court on appeal from the Chancery Court of Scott County, Mississippi. The chancellor granted Donna Rogers Morin ("Donna") and Mark Morin ("Mark") a divorce on the grounds of irreconcilable differences. Custody of their minor child, Erin Morin ("Erin") was granted to Donna. Mark was granted unsupervised visitation with Erin. The chancellor divided the marital property, granted Donna lump sum alimony, and awarded Mark damages for defending against sexual abuse allegations. Donna filed a timely notice of appeal to this Court.

### FACTS AND DISPOSITION BELOW

¶2. Mark Morin ("Mark") was born on September 17, 1962, and graduated from the United States Military Academy in 1984. On April 27, 1985, Mark married Angela Mae Patton ("Angela"), and they had one child, Ellen Morin ("Ellen") who was born on September 25, 1985. Mark and Angela were divorced on April 5, 1987, and Mark was awarded sole custody and control of Ellen.

¶3. Donna Rogers Morin ("Donna") was born on November 24, 1967. She attended East Rankin Academy and earned an Associate Degree from Phillips College. She began employment with American Airlines as a flight attendant in the summer of 1988. Donna and Mark met in June of 1989 in Washington, D.C., while Donna was working for American Airlines. In October of 1989, Donna moved to Massachusetts to be near Mark. After dating for approximately one year, Donna and Mark married on

August 4, 1990, in Fitchburg, Massachusetts. Donna, Mark, and Ellen moved to South Carolina in July of 1992. Donna later gave birth to their own child, Erin Morin ("Erin") on September 23, 1992.

¶4. During the course of their marriage, Donna and Mark experienced a great deal of marital difficulty. Donna, along with Ellen and Erin, would leave Mark for periods of time and stay in Forest, Mississippi, with Donna's parents. For example, the couple was separated from November of 1992, until February of 1993, and again from February of 1994, until July or August of 1994. Following each separation, the couple would reconcile, and Donna and the girls would return home. The couple finally separated on June 26, 1995. Donna filed for divorce and asked the court for custody of Ellen and Erin. Donna subsequently filed an amended complaint where she alleged that Mark had abused both minor children. Some time later, sexual abuse allegations were also made against Mark in regards to Erin. A temporary hearing was held on August 11, 1995, and the court found no evidence to suggest that Mark had abused Ellen or Erin.

¶5. Angela Mae Patton, Mark's first wife, filed a complaint for intervention and asked the court to incarcerate Mark and award custody of Ellen to her. Angela later returned to North Carolina and dropped out of this litigation.

¶6. Mark was awarded custody of Ellen, and Donna was awarded custody of Erin. Mark was granted reasonable rights of visitation with Erin.

¶7. Aggrieved by the judgment and findings of the chancellor, Donna raises fourteen assignments of error which we rephrase as follows:

**I. WHETHER THE CHANCELLOR ERRED BY DISMISSING DONNA'S THIRD MOTION FOR NEW TRIAL BASED UPON POST-TRIAL DISCOVERY OF DOCUMENTARY PROOF OF MARK'S PERJURY?**

**II. WHETHER THE CHANCELLOR COMMITTED REVERSIBLE ERROR BY ALLOWING THE EXPERT WITNESS, HERZOG, TO GIVE EXPERT OPINION TESTIMONY IN ANOTHER FIELD?**

**III. WHETHER THE CHANCELLOR COMMITTED REVERSIBLE ERROR BY ORDERING DONNA TO STOP RECORDING TELEPHONE CONVERSATIONS ON HER PHONE?**

**IV. WHETHER THE CHANCELLOR COMMITTED REVERSIBLE ERROR BY ORDERING THE GUARDIAN AD LITEM NOT TO LISTEN TO RECORDED TELEPHONE CONVERSATIONS OF THE MINOR CHILD?**

**V. WHETHER THE CHANCELLOR COMMITTED REVERSIBLE ERROR BY NOT ADMITTING THE TELEPHONE CONVERSATIONS INTO EVIDENCE?**

**VI. WHETHER THE CHANCELLOR COMMITTED REVERSIBLE ERROR BY RELIEVING MARK OF COURT ORDERED PSYCHOLOGICAL TESTING?**

**VII. WHETHER THE CHANCELLOR ERRED BY FINDING THAT THE BURDEN OF PROVING SEXUAL ABUSE HAD NOT BEEN MET?**

**VIII. WHETHER THE CHANCELLOR ERRED BY OVERRULING DONNA'S FIRST MOTION FOR NEW TRIAL?**

**IX. WHETHER THE CHANCELLOR ERRED BY DENYING DONNA'S REQUEST FOR ALIMONY?**

**X. WHETHER THE CHANCELLOR ERRED BY AWARDING MARK MONEY JUDGMENT FOR DEFENDING AGAINST A SEXUAL ABUSE SUIT?**

**XI. WHETHER THE CHANCELLOR ERRED BY OVERRULING DONNA'S SECOND MOTION FOR NEW TRIAL?**

**XII. WHETHER THE CHANCELLOR ERRED BY DENYING DONNA'S REQUEST FOR ATTORNEY'S FEES AND LITIGATION EXPENSES?**

**XIII. WHETHER THE LOWER COURT SHOULD BE REVERSED IN THE INTEREST OF JUSTICE?**

**XIV. WHETHER THE CHANCELLOR ERRED IN DENYING DONNA'S REQUESTS FOR RECUSAL?**

## DISCUSSION

¶8. This Court will not reverse a chancery court's findings of fact where they are supported by substantial credible evidence in the record. *Anderson v. Burt*, 507 So.2d 32, 36 (Miss.1987); *Norris v. Norris*, 498 So.2d 809, 814 (Miss.1986); *Gilchrist Mach. Co. v. Ross*, 493 So.2d 1288, 1292 (Miss.1986); *Cotton v. McConnell*, 435 So.2d 683, 685 (Miss.1983); *Culbreath v. Johnson*, 427 So.2d 705, 707-09 (Miss.1983); *Richardson v. Riley*, 355 So.2d 667, 668 (Miss.1978).

¶9. On visitation issues, as with other issues concerning children, the chancery court enjoys a large amount of discretion in making its determination of what is in the best interests of the child. *Harrell v. Harrell*, 231 So.2d 793, 797 (Miss.1970). Our Court has held that the best interest of the child is the main concern in determining visitation. *Dunn v. Dunn*, 609 So.2d 1277, 1286 (Miss. 1992). Mississippi law favors maintaining relationships between parents and their children even though the parent may be non-custodial. *Id.*

### I.

¶10. Donna argues that the chancellor erred in denying all three of her motions for new trial and her motions for recusal. Donna addresses these arguments in three separate issues. However, each of the motions for new trial and recusal will be addressed together here.

¶11. "Trial judges are vested with considerable discretion in ruling on motions for new trial, and it has been noted on numerous occasions that '[t]his Court will reverse a trial judge's denial of request for new trial only when such denial amounts to a [sic] abuse of that judge's discretion.'" *Muhammad v. Muhammad*, 622 So.2d 1239, 1250 (Miss. 1993) (citing *Bobby Kitchens, Inc. v. Mississippi Ins. Guar. Ass'n*, 560 So.2d 129, 132 (Miss. 1989)). Also, this Court will apply the manifest error standard in reviewing a judge's refusal to recuse himself. *Burnham v. Stevens*, 734 So.2d 256, 261 (Miss. 1999); *McFarland v. State*,

707 So.2d 166, 180 (Miss. 1997); *Bredemeier v. Jackson*, 689 So.2d 770, 774 (Miss. 1997).

### A. First Motion for New Trial and Recusal

¶12. On March 13, 1998, Donna filed her first Motion for New or Amended Findings, or a New Trial. In her first motion, Donna argued that the chancellor mistakenly believed that she and Angela Patton had agreed or conspired to obtain custody of Ellen for Donna. For this reason, Donna alleged that this mistaken belief led to the judgment for Mark and she should be granted a new trial. As earlier stated, the denial of a new trial will be upheld unless the judge abused his discretion. *Muhammad*, 622 So.2d at 1250.

¶13. In his opinion, the chancellor found that, following the temporary hearing, Donna located Angela Patton, Mark's first wife and the mother of Ellen. The judge noted that prior to November of 1995, Angela had not seen Ellen since 1989. Coincidently, Angela surfaced and filed a complaint for intervention requesting that Mark be incarcerated, custody of Ellen be awarded to her, and visitation rights be awarded to Donna. Donna and Angela had also agreed to a temporary visitation plan where Angela would visit Ellen in Donna's home. The court ordered that it was not assuming jurisdiction of the action by Angela against Mark concerning custody of Ellen. The court finally entered an order incorporating its opinion, and Angela returned to North Carolina. Angela never returned to this litigation, however, Angela's attorney then became the attorney for Donna. Whether the chancellor was correct in believing that Angela and Donna had some sort of agreement is irrelevant to whether a new trial should be granted. Our Court has held that "[e]ven if [the appellate court] disagreed with the lower court on the finding of fact and might have arrived at a different conclusion, we are still bound by the chancellor's findings unless manifestly wrong . . ." *Pieper v. Pontiff*, 513 So.2d 591, 594 (Miss. 1987) (citing *Richardson v. Riley*, 355 So.2d at 668).

¶14. In her first Motion for Recusal Donna alleged that the chancellor clearly expressed his opinions of her and concluded that she lacked credibility. For this reason, Donna argues that the chancellor should have recused himself from this bifurcated trial due to his prejudice against her.

¶15. We find that the chancellor had ample opportunity to listen to the testimony of witnesses, weigh the evidence, and determine the credibility of the witnesses. This trial went on for 18 to 19 days. There is nothing in the record to establish that the chancellor committed error in finding that Mark was allowed unsupervised visitation with Erin. The standard applied to a judge's refusal to recuse himself is the manifest error standard. *Burnham*, 734 So.2d at 261. Our Court has held that a judge should recuse himself if a reasonable person would have doubts about his impartiality. *McBride v. Meridian Pub. Improvement Corp.*, 730 So.2d 548, 551 (Miss. 1998). Nothing in this record would make a reasonable person harbor any doubts about the chancellor's impartiality. For this reason, we find that the chancellor did not abuse his discretion in failing to recuse himself from this case.

### B. Second Motion for New Trial

¶16. Donna's second Motion for New Trial was filed on July 1, 1998, following the chancellor's opinion addressing the issues of alimony and attorney's fees. Donna argued that the chancellor committed error in his findings regarding her earning capacity, Mark's earning capacity, and Mark's necessary living expenses. For this reason, Donna asserted that she was entitled to a new trial.

¶17. The chancellor found that Mark's gross monthly income was $4,170.00. Mark's current living expenses total $4,635.90 per month for himself, with an additional $1,040.00 for Ellen, for a total of $5,

675.90 per month. Mark had cashed in his 401(k) retirement plan to pay for the expenses of litigation. The chancellor also found that Mark's total liabilities were $39,714.64.

¶18. Donna's gross monthly income was $1,535.62. She will also receive child support from Mark in the amount of $470.00 per month. The chancellor found that her current income from American Airlines was not reflective of her earning capacity. For example, Donna is guaranteed 71 hours of flying time per month, or 16 ½ hours per week. The chancellor noted that Donna has elected to only work 2 days per week, giving her 5 days per week off. He stated that Donna had arrived at the $1,535.62 figure by using her 1997 W-2 from American Airlines. In 1997, she took family and medical leave to be with her mother, and also took time off for this litigation. The chancellor found that if Donna elected to work thirty hours per week, her gross salary would be $3,757.77 per month. For this reason, the chancellor concluded that her stated earning capacity of $1,535.62 was a gross understatement.

¶19. The chancellor reasoned that "[i]f there are sufficient marital assets which, when equitably divided and considered with each spouse's non-marital assets, will adequately provide for both parties, no more need to be done." The chancellor had already granted lump sum alimony to Donna in the amount of $12,426.92. Finding that both parties were practically bankrupt and had basically the same amount of liabilities, the chancellor found that no periodic alimony was necessary. We find that the chancellor did not abuse his discretion in denying Donna's Second Motion for New Trial.

     C. Third Motion for New Trial

¶20. In her last Motion for New Trial, Donna alleged that due to the discovery of documentary proof of Mark's perjury, a new trial should have be granted. Donna argued that Mark listed owning one Buick on his financial declaration. However, shortly after trial, Donna received an insurance statement in the mail for Mark which showed he had purchased a 1998 Dodge on or before March 19, 1998. Upon receipt of this statement, Donna filed her Third Motion for New Trial and Recusal.

¶21. Mark and Donna argue in their briefs about the purchase date of the 1998 Dodge. Mark argues that the March insurance statement reflected his already existing policy and that he purchased this new automobile on April 29, 1998. His financial statement was dated on April 8, 1998. This statement was before he purchased the new automobile.

¶22. Assuming that Mark did purchase this truck before trial was over, Donna has failed to show in her brief how the outcome of this case would be different with this new information. In *Mayoza v. Mayoza*, 526 So.2d 547, 549 (Miss. 1988), our Court stated that "Rule 59 imports a different, stricter standard. In this non-jury setting the Chancery Court necessarily focuses upon the *merits* of the case. The Court has the discretion to order a rehearing or to alter or amend the judgment if convinced that a mistake of law or fact has been made, or that injustice would attend allowing the judgment to stand." *Id.* Again, this Court will not disturb a chancellor's findings unless the appellant (Donna) can demonstrate that they "were manifestly wrong and against the overwhelming weight of the evidence." *Richardson*, 355 So.2d at 668.

## II.

¶23. Second, Donna argues that the chancellor erred in allowing Dr. Angela Herzog to give an opinion in an unrelated field from which she was submitted as an expert. Dr. Herzog received her Ph.D. in Clinical Psychology from the University of Mississippi. She completed her residency at the University of Texas

Health Science Center in San Antonio. Dr. Herzog has been practicing as a licensed clinical psychologist since 1983. The defense tendered the witness as an expert in the field of clinical psychology.

¶24. Donna also conducted voir dire of Dr. Herzog and specifically asked if Dr. Herzog had any experience testifying in child sexual abuse cases. Dr. Herzog stated that she had provided this type of testimony in Hinds, Madison, and Rankin counties. Donna asked Dr. Herzog if she had made any presentations (seminars, etc.) regarding child sexual abuse and she responded, "I have presented workshops or seminars or in-service training or those sorts of continuing education or professional association presentations." The court asked if Donna objected to Dr. Herzog being tendered as an expert witness. Donna responded that she did not challenge her credentials as a clinical psychologist; she only challenged her credentials "[i]n the field of child sexual abuse." To this, the court responded "[s]he's not tendered in that field." After this, Donna had no further questions.

¶25. Later, during the testimony of Dr. Herzog, Mark asked Dr. Herzog, whether in her opinion, there was any truth to the sexual abuse allegation raised by Donna. Donna and the guardian ad litem objected stating that Dr. Herzog was not qualified to give this type of opinion testimony. Their objection was based on the fact that she was only tendered as an expert in clinical psychology.

¶26. At this point, the court discussed further with Dr. Herzog any additional qualifications that might satisfy these objections. Dr. Herzog then testified that "[a] clinical-a psychologist has an area of specialty that is designated based on their training and education; and that can be clinical, counseling, school or educational, industrial, organizational; and that about encompasses it. Clinical psychology is more specifically encompassing of various areas of personality, psychological and mental distress or disorders and would include sexual abuse." Then, Dr. Herzog was asked if she had any experience in the area of child sexual abuse, and she again answered affirmatively. When asked specifically as to what experience she had with child sexual abuse cases, she answered:

> My education and training enables me to make diagnostic and treatment or intervention with people who have a variety of emotional or psychological difficulties. Therefore, because I have had all of these courses, for example, as would be pertinent to this case, in developmental psychology in children and have done work with and have had training in how to diagnose a variety of mental disorders, if a child has been sexually abused, I am trained to look at the signs and symptoms that would result in a conclusion and a diagnosis as appropriate that the chid carries the diagnosis, based on signs and symptoms, as a result of sexual abuse. That -- and I'm specifically talking about sexual abuse, because a child also could be -- have an anxiety disorder or a post-traumatic stress disorder or reasons other than child sexual abuse. My training is to look for those signs and symptoms; and I'm clearly trained and educated in clinical psychology for looking for all kinds or signs and symptoms of mental disorders, whether they be with children or adults or adolescents. I particularly have done a good bit of work with children and adolescents; and that was my residency focus.

After hearing this testimony from Dr. Herzog and referring to her earlier testimony that she had testified in six child sexual abuse cases in the last two years, the chancellor overruled the objection. He allowed Dr. Herzog to answer a question regarding Erin's psychological status. Dr. Herzog answered that Erin did not present signs and symptoms of a mental disorder that would be based in etiological factors of sexual abuse.

¶27. The qualification of an expert in fields of scientific knowledge are left to the sound discretion of the trial court. Its determination on this issue will not be reversed unless it clearly appears that the witness is not

qualified. *Crawford v. State*, 754 So.2d 1211, 1215 (Miss. 2000). This Court has held that the admission of expert testimony in the form of opinions or otherwise is vested in the sound discretion of the chancellor. *Newsom v. Newsom*, 557 So.2d 511, 515 (Miss. 1990). "This Court reviews the trial court's decision to allow expert testimony under the well-known clearly erroneous standard." *Puckett v. State*, 737 So.2d 322, 342 (Miss. 1999). Similarly, an expert's testimony is always subject to M.R.E. 702. For a witness to give a M.R.E. 702 opinion, the witness must have experience or expertise beyond that of an average adult. *Id.*

¶28. By applying this Court's precedent to the case sub judice, we find that the chancellor did not abuse his discretion by allowing Dr. Herzog to testify as to whether Erin had symptoms of a sexually abused child. The chancellor first reviewed Dr. Herzog qualifications and experience in the area of child sexual abuse. He found that she had also testified in approximately six child sexual abuse cases in the last two years. Based on this information, the chancellor concluded that Dr. Herzog did have the experience and expertise to give an opinion regarding Erin's particular symptoms. We find that M.R.E. 702 was satisfied, and the chancellor was correct in allowing the testimony.

### III.

¶29. Donna next addresses whether the chancellor erred in ruling on certain issues regarding taped telephone conversations between Mark and Erin. These three issues will be combined and discussed below.

#### A. Chancellor ordered Donna to stop recording phone conversations

¶30. Donna argues that the chancellor committed reversible error by ordering her to stop recording telephone conversations on her home telephone. Our Court has held that "[i]f there is no prohibition against a spouse recording the conversations of another spouse within the marital home, then it follows that there should be no prohibition against a custodial parent recording the conversations of her children in the custodial home." *Wright v. Stanley*, 700 So.2d 274, 279 (Miss. 1997). In *Wright*, Steve Wright argued that his former wife violated state law by tape-recording conversations of Steve and his children without their consent. *Id.* Our Court held that the Mississippi wiretap prohibition is almost identical to its federal counterpart. *Id.* at 280. We went on to find that the statute did not apply to Steve's former wife as she was a subscriber to a telephone operated by a communication common carrier which intercepted communications on her telephone. *Id.* Miss. Code Ann. § 41-29-535 (1993) provides:

> This article shall not apply to a person who is a subscriber to a telephone operated by a communication common carrier and who intercepts a communication on a telephone to which he subscribes. This article shall not apply to persons who are members of households of the subscriber who intercept communications on a telephone in the home of the subscriber.

Miss. Code Ann. § 41-29-535 (1993). For this reason, this Court held that it is permissible to record what one could hear by picking up an extension phone. *Id.* at 279.

¶31. Based on this Court's precedent, the chancellor did err in ordering Donna to cease recording telephone conversations between Mark and Erin on her own telephone. However, due to our holding in part III (C), we find this error to be harmless.

#### B. The Chancellor did not allow the Guardian Ad Litem to listen to recorded conversations

¶32. The guardian ad litem requested to be allowed to listen to "unedited tapes" of Mark and Erin that were recorded by Donna primarily to prove that Mark was allowed to make phone calls to the child. "Children are best served by the presence of a vigorous advocate free to investigate, consult with them at length, marshal evidence, and to subpoena and cross-examine witnesses." *In re R.D.*, 658 So.2d 1378, 1383 (Miss. 1995) (citing *Shainwald v. Shainwald*, 395 S.E.2d 441, 444 (S.C. Ct. App. 1990)).

¶33. Donna basically argues that the guardian ad litem (GAL)could not do a thorough job without listening to the recorded telephone conversations. During the trial, the chancellor noted that these tapes had not been made available to the defense until five or six business days before trial. Additionally, the tapes were not time and date stamped, and more importantly, all of the conversations were not recorded. Rather, it appears only certain "selective" recordings were made by Donna. For example, at trial, Donna testified that "I might have not recorded some here or there . . . ." The chancellor also heard testimony from Donna that it would take days for the GAL and the attorneys to listen to all of these tapes. The chancellor reasoned that the tapes would not be admissible and should not be heard by the GAL. He concluded that if the GAL listened to them, then the attorneys would also need to hear them. When the issue arose again during trial, Mark's attorney stated "I have - - I have never laid eyes on so much as a copy." The GAL had seen one of the tapes, and even Donna's attorney had only listened to a small portion of one of the tapes. The chancellor found that, if the tapes were made available to the parties, it would require a lengthy continuance. For these reasons, the chancellor ruled that the tapes were inadmissible. Finding that the tapes were inadmissible evidence, he prohibited the guardian ad litem from listening to them.

C. Tape recordings were not allowed into evidence

¶34. On September 8, 1995, Mark made a request for production asking for "originals and/or copies of any and all documents." This request included any "originals and/or copies of any document in your possession or in the possession of anyone in your employ which are relevant to any of the allegations made in your Amended Bill of Complaint . . ." Donna waited until the eleventh hour and did not produce these tape recordings until five or six business days before trial. The chancellor issued an order on June 2, 1997, which prohibited Donna, her attorneys, and her witnesses from referring to, or introducing the recorded conversations. Neither Mark, Donna, nor the GAL requested a continuance. This issue was raised again at trial when the GAL argued that he should be allowed to listen to the tapes. The chancellor again ruled that the tape recordings were not admissible evidence based on a discovery violation.

¶35. A discovery violation can normally be cured by taking a brief recess and allowing the opposing side to review the undisclosed documents. However, in this case, the chancellor found that there were 12-15 tapes, and the chancellor was advised by Donna that it would take several days for the attorneys and the GAL to listen to all of them. Apparently all parties and the GAL were in agreement with Donna's statement. The tapes were also incomplete in that all of the conversations had not been recorded by Donna. The chancellor is the only one who ever referred to a continuance. Again, neither Mark, Donna, nor the GAL requested a continuance.

¶36. We find that under these unusual facts, the chancellor did not abuse his discretion by refusing to admit the tape recordings into evidence based upon his ruling that there was a discovery violation and that violation could not be cured by a brief recess.

**IV.**

¶37. Donna next argues that the chancellor committed reversible error by relieving Mark from court-ordered comprehensive psychological testing. This issue is without merit. The Guardian Ad Litem's report suggested that a court-ordered psychologist be appointed. Pursuant to that suggestion, on May 16, 1997, the chancery court appointed Dr. Gerald O'Brien of Jackson, Mississippi. The court further ordered that "Donna Morin and Mark Morin shall appear at the offices of Dr. Gerald O'Brien for comprehensive psychological testing."

¶38. On June 3, 1997, Dr. O'Brien submitted his report and findings to the court which stated that he had evaluated both Mark and Donna. Dr. O'Brien's extensive findings and test results are found in the record. For this reason, Donna's argument that Mark did not submit to this testing is erroneous and without merit.

## V.

¶39. Donna next argues that the chancellor committed reversible error in finding that the burden of proving child sexual abuse had not been met. This Court is "required to respect the findings of fact made by a chancellor supported by credible evidence and not manifestly wrong." *Newsom v. Newsom*, 557 So.2d 511, 514 (Miss. 1990). "The chancellor, by his presence in the courtroom, is best equipped to listen to witnesses, observe their demeanor, and determine the credibility of the witnesses and what weight ought to be ascribed to the evidence given by those witnesses." *Carter v. Carter*, 735 So.2d 1109, 1114 (Miss. 1999).

¶40. The evidence in this case was conflicting. However, there was "credible evidence" to support the chancellor's finding that Mark had not sexually abused Erin. *Newsom*, 557 So.2d at 514. Some of that evidence included:

1. Dr. Angela Herzog, a clinical psychologist, determined that "the probability is that she [Erin] was not abused.

2. Dr. Melinda Ray, Erin's pediatrician, examined Erin on the day that Erin returned from a visit with Mark in Massachusetts. Dr. Ray testified that Erin's chief complaint was a runny nose. Dr. Ray did not observe anything about Erin or her demeanor that was indicative of child sexual abuse.

3. Dr. Billy Fox, a psychologist, was asked at trial if he believed or suspected that Erin was a victim of child abuse. He testified, "[n]o, I felt like what she was going through was what children go through in divorces."

4. Dr. Harriet Hampton did find that Erin suffered from Class II findings. She testified that these findings *can* be consistent with sexual abuse.

5. Erin did make retractions about her earlier statements to her doctors. For example, on January 8, 1997, during a session with Brenda Donald, Donald's notes indicate that Erin said her daddy did not do it "but don't tell mama." In another session when Donald asked Erin if her father had touched her tee-tee, Erin responded "uh-huh," indicating "no" according to Donald.

6. Dr. Gerald O'Brien, the court-appointed psychologist , found that "current accusations are not supported by the psychological test results obtained here."

7. The Guardian Ad Litem, Bill May, stated in his report to the court that "the fact still remains that the

question of sexual abuse is not clear cut and, at best, is extremely conflicting."

8. The Scott County Department of Human Services conducted an investigation and found the allegation of sexual abuse to be unsubstantiated.

¶41. "It is settled law that the weight to be accorded expert opinion evidence is solely within the discretion of the judge sitting without a jury. While he may not arbitrarily fail to consider such testimony, he is not bound to accept it. In the ultimate analysis, the trier of fact is the final arbiter as between experts whose opinions may differ. . ." *Newsom*, 557 So.2d at 515 (citing *Pittman v. Gilmore*, 556 F.2d 1259 (5th Cir. 1977).

¶42. We find that there was credible evidence to support the chancellor's conclusion that Mark had not abused Erin. Thus, the chancellor did not abuse his discretion.

## VI.

¶43. The next issue presented to this Court is whether the chancellor erred in denying Donna's request for periodic alimony? In *Hammonds v. Hammonds*, 597 So.2d 653, 655 (Miss. 1992), this Court established the following factors to be considered when making a determination as to whether alimony is warranted:

1. the income and expenses of the parties;

2. the earning capacities of the parties;

3. the needs of each party;

4. the obligations and assets of each party;

5. the length of the marriage;

6. the presence or absence of minor children in the home, which may require that one or both of the parties either pay, or personally provide, child care;

7. the age of the parties;

8. the standard of living of the parties, both during the marriage and at the time of the support determination;

9. the tax consequences of the spousal support order;

10. fault of misconduct;

11. wasteful disposition of assets by either party;

12. any other factor deemed by the court to be "just and equitable" in connection with the setting of spousal support.

*Id.* This Court has also held that a chancellor's "decision on alimony will not be disturbed on appeal unless it be found against the overwhelming weight of the evidence or manifestly in error." *McNally v. McNally*,

516 So.2d 499, 501 (Miss. 1987). The chancellor also noted in his opinion that "[i]f there are sufficient marital assets which, when equitably divided and considered with each spouse's non-marital assets, will adequately provide for both parties, no more need to be done."

¶44. In determining whether periodic alimony was appropriate, the chancellor first considered the length of the marriage between Donna and Mark. The couple married on August 4, 1990, and Donna filed her complaint for divorce on August 1, 1995. During this time, the chancellor considered the months that the couple lived apart and determined that Donna and Mark actually lived together for 49 months of their marriage.

¶45. The chancellor next considered the earning capacity of the parties. Mark's net income is $2,907.32 per month. Mark's total living expenses are $5,675.90 per month. Mark had cashed in his 401(k) retirement plan to pay expenses of this litigation. Donna's current income is $1,535.62 per month. This does not include the $470.00 per month that she receives from Mark in child support for Erin. The chancellor did not believe this figure was consistent with her potential earning capacity. He found that Donna was only working part-time and could be earning more if she increased her work to more that 2 days a week.

¶46. Mark owns a 1993 Buick Century and had a checking account balance of $325.54. Donna owns a 1994 Pontiac and had a checking account balance of $89.22. Mark's total liabilities were $39,714.64. Donna's total liabilities were $96,017.23, of which approximately $91,000.00 had been incurred in connection with this litigation.

¶47. The chancellor noted that the parties had agreed to equitably divide their assets. In his opinion, the chancellor charted exactly what each party held as assets, and what the value of those assets totaled. In the end, Donna had a total marital property value of $9,761.00 and Mark had a total marital property value of $34,614.84. This left a disparity of $12,426.92 to Donna. For this reason, the chancellor awarded lump sum alimony to Donna in the amount of $12,426.92 to equalize the parties' asset value. Mark's non-marital assets were valued at $2,205.00, and Donna's non-marital assets were valued at $785.00.

¶48. The chancellor next ordered Mark to pay Donna 14% of his adjusted gross income in child support payments on behalf of Erin.

¶49. The couple's only joint debt was for Donna's Pontiac automobile, and she agreed to assume, pay for, and hold Mark harmless for it.

¶50. Next, the chancellor found that other than liabilities incurred due to this litigation and the lump sum alimony agreed to by the parties, Mark and Donna's liabilities were similar.

¶51. The chancellor noted that Mark and Donna are both between the ages of 30 and 34 years old with many years of life expectancy remaining.

¶52. In conclusion on this issue, the chancellor noted that "alimony should be considered only if the situation is such that an equitable division of marital property, considered with each party's non-marital assets, leaves a deficit for one party." The chancellor had already awarded Donna lump sum alimony in the amount of $12,426.92 to make up for the difference between her and Mark's asset value. Also, he found that the difference in value of the couple's non-marital assets was only $1,420.00 in favor of Mark. He concluded that this was an insignificant amount considering the parties are both, in actuality, bankrupt. "Therefore, since a division of marital and non-marital property leaves a deficit for both parties, it is considered the

opinion of this Court that an award of periodic alimony is not warranted." The chancellor, after finding that periodic alimony was not warranted, then went into an in-depth analysis of each factor to be considered in the award of alimony.

¶53. As earlier stated, this Court has also held that a chancellor's "decision on alimony will not be disturbed on appeal unless it be found against the overwhelming weight of the evidence or manifestly in error." *McNally*, 516 So.2d at 501. The chancellor's decision on periodic alimony was supported by substantial evidence, and he made specific findings of fact in his opinion to support this ruling.

## VII.

¶54. Next, Donna argues that the chancellor committed reversible error in awarding Mark a money judgment against her. In the chancellor's final opinion, he awarded Mark the sum of $39,350.67 for defending against the sexual abuse allegations. He found that this was consistent with Miss. Code Ann. § 93-5-23 which provides, in pertinent part, as follows:

> Whenever in any proceeding in the chancery court concerning the custody of a child a party alleges that the child whose custody is at issue has been the victim of sexual or physical abuse by the other party, the court may, on its own motion, grant a continuance in the custody proceeding only until such allegation has been investigated by the Department of Human Services. At the time of ordering such continuance the court may direct the party, and his attorney, making such allegation of child abuse to report in writing and provide all evidence touching on the allegation of abuse to the Department of Human Services. The Department of Human Services shall investigate such allegation and take such action as it deems appropriate and as provided in such cases under the Youth Court Law (being Chapter 21 of Title 43, Mississippi Code of 1972) or under the laws establishing family courts (being Chapter 23 of Title 43, Mississippi Code of 1972).

> If after investigation by the Department of Human Services or final disposition by the youth court or family court allegations of child abuse are found to be without foundation, the chancery court ***shall order the alleging party to pay all court costs and reasonable attorney's fees incurred by the defending party in responding to such allegation.***

Miss. Code Ann. § 93-5-23 (Supp. 2000)(emphasis added).

¶55. Donna's original complaint prayed for custody of Erin and Ellen. Additionally, Donna amended her complaint on August 17, 1995. She again asked for custody of both girls and further alleged that Mark had been "guilty of abuse and neglect of the Plaintiff's step-child, Ellen Ruth Morin, age 9." Donna argues that since the couple finally stipulated that custody of Erin should be awarded to Donna, Miss. Code Ann. § 93-5-23 does not apply because custody was not an issue. Contrary to this allegation, custody was an issue for almost 3 years prior to this stipulation. For this reason, Miss. Code Ann. § 93-5-23 does apply, and the chancellor was within his discretion to award reasonable attorney's fees to Mark based on the statute.

¶56. This Court does not desire to discourage legitimate, founded claims of child sexual abuse. However, in this case, there was substantial credible evidence contradicting child sexual abuse as determined by the chancellor. The statute provides that the chancellor *shall* require the offending party to pay all court costs and reasonable attorney's fees, thus the chancellor was required to grant reasonable attorney's fees to Mark.

**VIII.**

¶57. Lastly, Donna argues that the court committed reversible error in failing to award her attorney's fees and litigation expenses. Again, whether to award attorney's fees is largely entrusted to the sound discretion of the chancellor. *McKee v. McKee*, 418 So.2d 764, 766 (Miss. 1982). As earlier discussed in this opinion, the chancellor had determined that both parties were basically bankrupt. The chancellor held that "[n]either party is financially able to pay their separate attorneys fees, much less those of the other. All that the parties have remaining is their wage capacity which, the court finds, is about equal for both."

¶58. For this reason, the chancellor did not abuse his discretion in failing to award the parties attorney's fees.

**CONCLUSION**

¶59. During 19 days of trial, the chancellor heard all of the witnesses, weighed the testimony, and made specific findings in his opinion. The only error we find is that the chancellor incorrectly ordered Donna to stop recording telephone conversations between Mark and Erin. However, this alone does not rise to the level of reversible error and is harmless considering our holding in part III (C). For all of the foregoing reasons, we find that the chancellor should be affirmed whereas his findings were supported by substantial credible evidence in the record. *Anderson*, 507 So.2d at 36. The judgment of the Scott County Chancery Court is affirmed.

¶60. **AFFIRMED.**

**PITTMAN, C.J., BANKS, P.J., MILLS, WALLER, DIAZ AND EASLEY, JJ., CONCUR. McRAE, P.J., AND COBB, J., CONCUR IN RESULT ONLY.**