648 So.2d 543 (1994)
Herman Martin HARRINGTON
v.
Donnett Hendry HARRINGTON.
No. 93-CA-00449.
Supreme Court of Mississippi.
December 21, 1994.
*544 William R. Ruffin, Bay Springs, for appellant.
Bobby L. Shoemaker, Bay Springs, for appellee.
Before PRATHER, P.J., and SULLIVAN and JAMES L. ROBERTS, Jr., JJ.
SULLIVAN, Justice, for the Court:
These parties were divorced on November 8, 1991. The Judgment of Divorce included a Child Custody, Child Support and Property Settlement agreement, in which Mark Harrington was granted overnight visitation on the first and third weekends of every month with his two daughters; Britanny, born on April 24, 1982, and Courtney, born May 22, 1983. He was also granted holiday visitation and summer visitation.
Donnett Harrington filed a Motion to Modify Judgment of Divorce in the Jasper County Chancery Court on August 26, 1992. Donnett alleged a material change in circumstances adversely affecting the children; namely that Mark Harrington was living with a female, Stephanie Milam, without the benefit of marriage.
The case was heard on January 26, 1993, before Chancellor H. David Clark, II. The chancellor found that a modification of Mark's visitation with his two minor daughters was warranted based on the fact that Mark was living with Stephanie without the benefit of marriage while simultaneously teaching his children Christian principles.
On March 11, 1993, Chancellor Clark ruled that Mark would no longer enjoy overnight visitation with his children. Mark was granted physical custody of the children every other weekend from 9:00 a.m. to 3:00 p.m. on Saturdays, and from 1:00 p.m. until 5:00 p.m. on Sundays. The chancellor ordered that at no time during the visitation would the children be allowed to be in the presence of Stephanie, nor would Mark be permitted to discuss his relationship with Stephanie  past, present or future.
Mark assigns one error on appeal:
That the new visitation rights granted unto him by the chancellor constitutes unreasonable visitation.
Donnett admitted that Mark has complied with the terms of the child custody, child support and property settlement agreement. At the hearing, Mark admitted living with Stephanie without being married to her, and that she stays in the house with him when the girls spend the night.
Mark stated that he is a Catholic and that he attempts to raise his children in a Christian environment. He admitted that he did not lead a perfect life and that in fact he did not believe in divorce but had to accept his situation. While admitting that he lived with Stephanie without the benefit of marriage, Mark stated that he did not believe that this confused or had any detrimental effect on the children. Mark denied that he has any knowledge of Stephanie ever cursing his children. Mark did admit, however, that Stephanie occasionally used foul language around adults. He added that his ex-wife, Donnett, had a whole vocabulary of foul language ready for use when her temper flared up.
Donnett testified that she believed Mark's living arrangement was detrimental to the children. She stated that the oldest daughter, Britanny, came home crying once because of something Stephanie said to her; specifically, "Britanny get off your f____ ass;" and on another occasion, "get off your lazy ass." Donnett claims that she contacted Mark after the first incident and that Mark defended Stephanie. Mark's testimony on this point was that he remembered being *545 contacted by Donnett, but recalled telling her that he would find out what had happened. Mark further testified that he spoke to both Britanny, and the younger child, Courtney, and they told him that Donnett, not Britanny, was upset.
Donnett was concerned that the youngest child, Courtney, thinks it's okay for Mark to have somebody there with him like that and the ten-year-old does not like it. She knows it's wrong. Mark testified that the children asked him on at least three occasions when he would be marrying Stephanie.
The chancellor found there to be a conflict in Mark's life (living with a woman to which he was not married while advocating Christian principles) which was detrimental and not in the best interest of the children. The chancellor cited evidence in the record to support his conclusion  namely, that the oldest daughter was upset.

DID THE NEW VISITATION RIGHTS GRANTED MARK BY THE CHANCELLOR CONSTITUTE UNREASONABLE VISITATION UNDER THE CIRCUMSTANCES?
The chancellor has broad discretion when determining appropriate visitation and the limitations thereon. White v. Thompson, 569 So.2d 1181 (Miss. 1990); citing Newsom v. Newsom, 557 So.2d 511, 517 (Miss. 1990); Clark v. Myrick, 523 So.2d 79, 83 (Miss. 1988); Cheek v. Ricker, 431 So.2d 1139, 1146 (Miss. 1983). When the chancellor determines visitation, he must keep the best interest of the child as his paramount concern while always being attentive to the rights of the non-custodial parent, recognizing the need to maintain a healthy, loving relationship between the non-custodial parent and his child. Id.
This Court will not reverse a chancellor's findings of fact so long as they are supported by substantial evidence in the record. Tedford v. Dempsey, 437 So.2d 410, 417 (Miss. 1983). However, this Court "will reverse when he is manifestly in error in his finding of fact or has abused his discretion." Hammett v. Woods, 602 So.2d 825, 828 (Miss. 1992).
In Dunn v. Dunn, 609 So.2d 1277, 1286 (Miss. 1992), this Court stated that there must be evidence presented that a particular restriction on visitation is necessary to avoid harm to the child before a chancellor may properly impose the restriction. Otherwise, the chancellor's imposition of a restriction on a non-custodial parent's visitation is manifest error and an abuse of discretion. Id. See also, Wood v. Wood, 579 So.2d 1271 (Miss. 1991). This Court, in Cox v. Moulds, 490 So.2d 866, 870 (Miss. 1986), stated that
the chancellor should approach the fixing of visitation rights with the thought in mind that, absent extraordinary circumstances militating to the contrary, the non-custodial parent will during the periods of visitation have broad authority and discretion with respect to the place and manner of the exercise of same, subject only to the time constrictions found reasonable and placed in the decree. Overnight visitation with the non-custodial parent is the rule, not the exception; indeed, a non-custodial parent is presumptively entitled during reasonable times to overnight visitation with the children.
The Dunn opinion held that the chancellor erred and abused his discretion by restricting visitation where there was no evidence presented that the child was being harmed or in any danger because of contact with the non-custodial parent's lover. Dunn at 1286. Furthermore, in Morrow v. Morrow, 591 So.2d 829, 833 (Miss. 1991), this Court stated that "[a]n extramarital relationship is not, per se, an adverse circumstance."
In the instant case, the chancellor lamented our present law in this area, stating:
Beginning not too many years ago, as our Supreme Court began to change, so did the law in this area. The law now, as this Court understands it, is that there must be some detrimental effect exhibited in order to modify the visitation as requested in this particular case. In other words, our present Supreme Court or the Supreme Court which has ruled on most recent cases in this arena has held that a Court  a trial court, hearing a case of this nature, cannot assume or presume detrimental effect, that it must be shown by *546 testimony. There were times in the past when, in all honesty, a case of this nature probably would never have come to trial. There was a time when courts, such as this Court, relied upon what we shall loosely refer to as morals to make decisions of this nature. Was it or was it not morally correct? Then our society began to change, and there are those who have said that, in our society, morals are going to hell in a handbag. That has been said millions of times; and, obviously, that's true. Unfortunately, our Supreme Court, on occasion, appears to be carrying that handbag. Instead of defending Judeo-Christian principles, upon which this nation was founded, the Supreme Court has dictated that courts of equity must go along with society; and, if society goes down the toilet, I assume we shall follow it. Society has definitely changed. It is not fashionable in certain circles to discuss things, such as morals or ethics. And, ultimately, in applying the law, as given to us by the Supreme Court, this Court cannot make the decision before it based upon morals or ethics, even though it is a court of equity. What is right, just and proper, according to current law, may not necessarily be moral or ethical.
So, as required by the most recent decisions from our Supreme Court, the Court will set aside its own notions of morality and ethics and set aside its own understanding of Christian principles and must make the decision before it, based upon whether or not it is in the best interest of the minor children to continue the visitation schedule as it currently exists in the November 8, 1991, Judgment of Divorce.
The chancellor went on to find that the visitation granted in the previous decree was not in the best interests of the children, citing the following evidence: (1) Mark teaches his children Christian principles while living with someone to whom he is not married; (2) the confusion that is caused by Mark's teaching one thing and living another; (3) the children are aware of this living arrangement and have inquired as to when Mark and Stephanie would marry; (4) Donnett's testimony stating that the daughters were upset because Mark lived with Stephanie out of wedlock; (5) the children were upset because of things said to them while exercising visitation with Mark.
The chancellor accorded great weight to the fact that Mark was professing one lifestyle while living another. There is substantial evidence in the record that Mark lives with Stephanie and that they are not married. There is also evidence that Mark is Christian and admittedly raises his children in a Christian environment. With regard to this issue, the chancellor stated:
All parents are called upon, morally, ethically, and legally, to teach their children certain things. One of the major problems that the Court sees in the case before it at this time is that you're trying to teach your children, or you are, in fact, teaching your children two different things; and, in the opinion of the Court, you've got to choose one or the other. It is not in the best interest of your children to be put in that situation. Whichever you choose is totally within your discretion. That's not a decision to be made by the Court. (Emphasis added).
One could conclude from the chancellor's analysis that if Mark were agnostic or atheist, there would be no problem with overnight visitation because the hypocrisy would be removed.
That notwithstanding, there is no indication from the record that Mark has, from a Christian standpoint, emphasized that living with a person of the opposite sex without being married to them is wrong. He is a Christian and arguably by his actions has condoned his living arrangement as an acceptable one. However, the chancellor maintains that Mark's living arrangement is detrimental to the children because (1) it is in conflict with his religion; and, (2) this conflict leads to his children being confused. Mark is Catholic. The divorce itself is in conflict with his religion.
There simply is not substantial evidence in the record supporting the chancellor's finding that the children are confused. Although Donnett testified that Britanny came home crying because Stephanie spoke to her in a harsh manner, there is no indication from the *547 record that she was suffering harm because of confusion resulting from her father's alleged hypocrisy. Furthermore, it is admitted by Donnett that the younger daughter thinks it is fine that her father lives with Stephanie. Moreover, even if Britanny is confused, or does not like her father living with Stephanie, this is not the type of harm that rises to the level necessary to overcome the presumption that a non-custodial parent is entitled to overnight visitation.
The chancellor also gave weight to the fact that the children were aware of Mark's living arrangement, and were concerned to the point of asking him when he would marry Stephanie. These facts are contained in the record. However, this does not constitute substantial evidence of harm or detriment to the children. Nothing in the record points to their alleged confusion being the source of their inquiry as to when their father would marry. The children may well have inquired about their father marrying Stephanie because they look forward to the marriage  because they like her and want them to be married.
In further support of his ruling, the chancellor relied on Donnett's testimony that Stephanie had spoken harshly to Britanny on two occasions. While we cannot condone that type of behavior, two instances of harsh language directed at a young girl by a non-custodial parent's lover, in order to discipline the child, is not substantial enough evidence of harm to restrict the visitation of the non-custodial parent in the manner done by the chancellor here. If that sort of verbal attack were an ongoing problem, or coupled with some other evidence of detrimental effect, like the children being unwilling to go visit with their father, restricted visitation might be warranted. Here, there is only evidence that this has taken place on two occasions, and both parties stated that there had been no difficulty in Mark exercising his visitation. Donnett furthermore stated that the children would be upset if they did not get to go visit with their father.
In response to a question from the chancellor Mark said that if his visitation were continued as it was, that perhaps he should not allow Stephanie to be at his home while the children were enjoying visitation.
This goes further than the law requires. While it is difficult for a mere human to live up to the tenets of Christianity, it is rare that the courts of this State punish such a failure. There are numerous Mississippi cases that would allow Mark to have visitation with his children without any restriction on his relationship with Stephanie. The better course of action would be that Stephanie did not stay overnight in the home with the children during that visitation. Morrow v. Morrow, 591 So.2d 829 (Miss. 1991); Kavanaugh v. Carraway, 435 So.2d 697 (Miss. 1983); Ballard v. Ballard, 434 So.2d 1357 (Miss. 1983); and Cheek v. Ricker, 431 So.2d 1139 (Miss. 1983).
The cases cited above primarily deal with actual custody and did not result in a change thereof. A change in custody is a far more drastic remedy than a change in visitation. The chancellor was absolutely without authority to prohibit Mark from discussing Stephanie with his children or his past, present or future plans concerning Stephanie. It is our opinion that the chancellor was manifestly wrong on the record in this case to restrict visitation and amend the prior visitation order. We therefore reverse the chancellor and reinstate the visitation under the prior order.
REVERSED AND RENDERED.
HAWKINS, C.J., PRATHER, P.J., and BANKS, McRAE and SMITH, JJ., concur.
JAMES L. ROBERTS, Jr., J., concurs in results only.
DAN M. LEE, P.J., concurs in part and dissents in part with separate written opinion joined by PITTMAN and JAMES L. ROBERTS, Jr., JJ.
DAN M. LEE, Presiding Justice, concurring in part; dissenting in part.
I concur with the majority's decision that the chancellor abused his discretion when he ordered that Herman Harrington not discuss his relationship with Stephanie Milam while in the presence of his two daughters. However, I respectfully dissent from the majority's *548 opinion in that I do not believe that the chancellor abused his discretion when he restricted Herman Harrington's overnight visitation rights with his two minor daughters.
Visitation and restrictions placed upon it are within the sound discretion of the chancellor. White v. Thompson, 569 So.2d 1181, 1185 (Miss. 1990), citing Newsom v. Newsom, 557 So.2d 511, 517 (Miss. 1990). Visitation should be established with the best interests of the children as the paramount consideration, keeping in mind the rights of the non-custodial parent and the objective that parent and child should have as normal a relationship as possible despite the fact that they do not live together. White, 569 So.2d at 1185, citing Clark v. Myrick, 523 So.2d 79, 83 (Miss. 1988). This Court will not reverse the chancellor's decision to restrict or limit visitation unless the chancellor abused his discretion. White, 569 So.2d at 1185.
In this case, the chancellor, after hearing all of the testimony, found that Herman Harrington should not have overnight visitation with his two minor daughters. The chancellor held that as long as Herman cohabited with Miss Milam without the benefit of marriage, he could not have overnight visitation with his two young daughters. It certainly appears to this Justice that the chancellor's decision to restrict Harrington's overnight visitation rights was not an abuse of discretion nor was it manifest error to restrict the girls' overnight visits. Hammett v. Woods, 602 So.2d 825, 828 (Miss. 1992), citing Lawrence v. Lawrence, 574 So.2d 1376, 1382 (Miss. 1991).
The issue in this case is quite simple. Shall this Court condone Herman's violation of Mississippi statutory law by reversing the chancellor's ruling, or shall this Court uphold the chancellor's decision and require that Herman follow the law of this State?
The chancellor in his Bench Opinion of January 26, 1993, found:
The Court has previously determined that, based upon the evidence presented before it, the visitation schedule, as set forth in the November '91 Judgment of Divorce, is not in the best interest of the minor children. That determination is based upon the opinion of the Court that Mr. Harrington, although he chooses to teach his children Christian principles, is, also, and, at the same time, living in the home with a person to whom he is not married in the presence of his children, who are well aware of that situation and have discussed it with him, to the extent of inquiring as to when he would marry. In the opinion of the Court, certainly that would be detrimental and not in the best interest of the children.
In the case at bar, the chancellor's concern was whether it was in the Harrington girls' best interest to have overnight visitation with their father interrupted while their father lived openly with Stephanie Milam in violation of the laws of the State of Mississippi. The majority goes into an unnecessary discourse as to whether Herman's attempts to raise his daughters in a moral atmosphere conflicts with his living with Miss Milam. While Herman's self-professed attempt to raise his children in a morally proper way appears to conflict with his current living arrangements, under the particular facts of this case, all that matters is that the chancellor, through the exercise of his discretion, after hearing all of the testimony, found that it was detrimental to the Harrington girls to have overnight visits with their father and his admitted live-in lover.
In Harris v. Harris, 343 So.2d 762, 764 (Miss. 1977), this Court reversed the chancellor's decision to modify a mother's right to custody of her young son because the mother belonged to a religion that practiced snake handling as part of their religious beliefs. This Court held that there was no evidence to indicate that the mother's attendance of this church had increased the child's risk of being bitten by a snake. This Court held that the chancellor had no authority to dictate what religion she should teach her child so long as it did not involve exposing him to physical danger or to what society in general deems immoral.
Likewise, should it not be said that the chancellor should not dictate Herman's personal behavior and how it affects his children unless his actions expose his children to *549 physical danger or to what society deems as immoral practices.
In the case sub judice, Herman Harrington admitted that he lived with Stephanie Milam and that they were not married. Harrington's and Milam's actions violate Miss. Code Ann. § 97-29-1 (1972). This section provides:
If any man and woman shall unlawfully cohabit, whether in adultery or fornication, they shall be fined in any sum not more than five hundred dollars each, and imprisoned in the county jail not more than six months; and it shall not be necessary, to constitute the offense, that the parties shall dwell together as husband and wife, but it may be proved by circumstances which show habitual sexual intercourse.
Whether Herman Harrington professed to be a Catholic, Baptist, Methodist, Jew, Muslim, Buddhist, Agnostic, or Atheist, the law of this state deems it immoral for two persons of the opposite sex who are not married to cohabit. Miss. Code Ann. § 97-29-1 (1972). In fact, Section 97 Chapter 29 is entitled Crimes Against Public Morals and Decency. It is quite clear that the legislature proscribed this behavior as immoral for all citizens, be they religious or not. Therefore, it is quite clear to this Justice that the chancellor below found that Herman's living arrangements violated the laws of this state and that this violation of the law was detrimental to the Harrington girls. Accordingly, I would suggest that the chancellor did not abuse his discretion when he restricted Herman's overnight visits with his daughter. For the reasons stated above, I concur in part and dissent in part.
PITTMAN and JAMES L. ROBERTS, Jr., JJ., join this opinion.