# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 2000-CA-01449-SCT

*LARRY LEWIS*

*v.*

*LOUISE ARMSTEAD BUTLER*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/26/2000 |
| TRIAL JUDGE: | HON. DENNIS M. BAKER |
| COURT FROM WHICH APPEALED: | PANOLA COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | ADAM A. PITTMAN |
| ATTORNEY FOR APPELLEE: | JAY WESTFAUL |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED- 9/13/2001 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 10/4/2001 |

**BEFORE McRAE, P.J., MILLS AND WALLER, JJ.**

**McRAE, PRESIDING JUSTICE, FOR THE COURT:**

¶1. Larry Lewis was found by the chancery court to have made improper sexual advances toward his oldest daughter, L. The court denied him visitation with both of his children. Lewis now seeks conditional visitation with certain restrictions to protect the children from potential harm. The findings of the chancellor were based on substantial evidence, and the denial of visitation was within his discretion. Therefore, the judgment of the chancery court is affirmed.

## FACTS

¶2. Although never married, Larry Lewis and Louise Butler have two female children together, L., born June 25, 1986, and Z. B., born June 20, 1990. They broke up in 1989, when Butler was pregnant with Z.B. Lewis testified that in 1989 or 1990, she had a restraining order placed against him. On November 28, 1995, he filed a petition to terminate the parental rights of Butler for custody of their two minor children, or in the alternative, for visitation with the children. Butler filed a request on April 10, 1997, asking him for voluntary dismissal of that portion of his complaint in which he seeks to have her parental rights terminated. The parties reached a temporary agreement on May 6, 1997, and on May 9, 1997, the chancery court entered an agreed order granting Lewis visitation with his two daughters, L. and Z. B.

¶3. No further action was taken until August 27, 1999, when Lewis filed a petition seeking to have Butler found in contempt of court and to have her parental rights terminated due to her refusal to allow him to exercise his visitation rights. Butler filed her response, alleging that her actions were justified due to Lewis's inappropriate behavior toward L. Butler also sought sanctions and attorney's fees based on his complaint.

¶4. On the day of trial, July 26, 2000, Lewis moved to dismiss that portion of the complaint in which he sought termination of Butler's parental rights. Lewis continued to seek visitation rights with the children, and

sanctions against Butler for violating the agreed visitation order.

¶5. Butler testified that she refused to allow him to exercise his visitation rights because of what L. told her after her last visit with Lewis. L. told Butler that Lewis took her to the bathroom, placed his hand on her bottom, and told her that after his girlfriend, Dorothy, left for work the next morning he would come to her room to wake her up so that she could go to his bed. L. informed Butler that she had switched beds with her younger sister, Z.B., and Lewis woke Z.B. up, instead of L. L. also told Butler that Lewis questioned her about her virginity and that he could easily find out if she were lying to him, by examining her.

¶6. L. was fourteen years old when she testified. She stated that she is scared of her father and does not want to return to his house. She said that she has never enjoyed visiting her father because she and her sister are forced to spend their visits doing chores and listening to him slander their mother. She testified:

> He makes me and my sister clean up all his cars, vacuum it out, clean the house, makes us clean, sometimes, along the side of the road, and pick up paper, mow the yard, lots of stuff . . . He tells me my mama is a bitch, and she is a whore, and she is nasty and all, something about all she do is go with dope dealers, and some stuff like that, he would say, crack-head.

¶7. The last time L. and Z.B. visited their father was in May 1999. L. testified that when she and Z.B. were cleaning his house on Friday night, he took her into the bathroom and told her that he wanted her to sleep with him that night. L. was supposed to wait until her sisters and little brother were asleep, at which time he would come back to the girls' bedroom and take her to his bedroom. Z.B. was outside of the room at this time, and Lewis told L. not to tell anyone about his plans.

¶8. That night, Lewis's live-in girlfriend, Dorothy Weeks, went to work at approximately 3:00 to 4:00 a.m., not to return until about 2:00 p.m. After Dorothy left, L. testified that her father came to the room where she and Z.B. were sleeping. The two girls had switched places, so he woke up Z.B. by mistake.

¶9. Later that morning, he made numerous comments about L. being scared of him. L. also testified that her father told her that when Dorothy and the other children went to the laundromat, he was going to make her stay with him. When she objected, he asked her if she had ever had sex. She responded "no" and he said "Well, I'm going to find out if you did, because I can be just like a doctor." When Dorothy left for the laundromat, L. went with her.

¶10. Upon returning home the following day, L. told her mother what had happened, and she thereafter refused to let Lewis see his daughters. She called the police, who contacted the Department of Human Services. The DHS conducted an investigation, but the department did not find enough evidence against him to proceed. At trial, he denied every aspect of L.'s testimony except that he made the girls work around the house.

¶11. The Department of Human Services has also conducted another investigation involving allegations against him. Butler had two daughters, T. and T. S., who lived with their mother and him prior to the couple's break up. When T. was approximately nine years old, the DHS conducted an investigation into possible sexual abuse by Lewis. T. testified that he would touch her vagina with his hand. Butler said that DHS personnel returned to the house on several occasions, but no charges were filed against him, nor were court proceedings initiated. Butler testified that she agreed to L. and Z.B.'s visitation because she did not want the girls to know what happened to T.

¶12. After hearing the testimony of the parties involved, the chancellor granted Lewis's motion for voluntary partial dismissal. The chancellor declined to find Butler in contempt of court, finding that her actions were justified by the evidence. The court further vacated the temporary order of May 9, 1997, and denied Lewis any visitation with his daughters. Butler was also granted a judgment against Lewis for $780.00.

## DISCUSSION

¶13. Lewis argues that the record contains no evidence of actual sexual abuse and that the Department of Human Services never took action in response to the two investigations that were conducted. Lewis states that the chancellor could have placed "reasonable restrictions or conditions" on his visitation to protect the children, and that the chancellor abused his discretion by "failing to find any way to attempt to foster some type of relationship between the father and his minor children." We uphold our earlier decision that "[v] isitation and restrictions placed upon it are within the discretion of the chancery court." *White v. Thompson*, 569 So.2d 1181, 1185 (Miss. 1990). In order for this Court to reverse the ruling of a lower court, the chancellor must be manifestly wrong, clearly erroneous, or apply an erroneous legal standard. *M.C.M.J. v. C.E.J.,* 715 So.2d 774,776 (Miss. 1998) (collecting authorities). A chancellor's findings of fact will not be disturbed on appeal where supported by substantial evidence in the record. *Smith v. Jones*, 654 So.2d 480, 485 (Miss.1995).

¶14. As to Lewis's contention that the chancellor should have awarded him conditional visitation, he cites *E.S. v. State*, 567 So.2d 848 (Miss. 1990), arguing that the father was found by the court to have sexually abused his child, and the court did not completely bar the father from visitation with his children. In *E.S.*, the abused child and her sister were removed from the home and placed in the Harrison County Family Court shelter facilities. The father denied the allegations, and E.S.'s mother testified that she believed him.

¶15. The family court found that E.S. had been sexually abused and ordered that the children be placed in the mother's home under the supervision of the Harrison County Welfare Department, that both parents and E.S. complete child abuse counseling and treatment, and that the father be enjoined from contact with the children until completion of the treatment. *Id.* at 849. We held that the family court's findings were based on substantial evidence and that the order was justified due to the fact that the father had already sexually abused one child. *Id.* at 851.

¶16. "The chancellor has broad discretion when determining appropriate visitation and the limitations thereon."*Harrington v. Harrington*, 648 So.2d 543, 545 (Miss. 1994). In doing so, the chancellor must balance the best interest of the child with the rights of the non-custodial parent, keeping in mind the "need to maintain a healthy, loving relationship between the non-custodial parent and his child." *Id.* Lewis denied every material statement made by L. and Z.B. The chancellor specifically found the children to be more credible than their father. In denying visitation, he held that no healthy relationship was possible between them and that denying visitation was in their best interests.

## CONCLUSION

¶17. When testimony conflicts, it is the chancellor's responsibility to determine the credibility of the witnesses, and to act as the "final arbiter" of the fact at issue. *Doe v. Doe*, 644 So.2d 1199, 1207 (Miss. 1994). We uphold the chancellor's finding of substantial evidence regarding Lewis's improper sexual advances toward L. Lewis poses a threat to his daughters, and it would be a mistake to place them under his supervision at this time. Therefore, the judgment of the chancery court is affirmed.

¶18. **AFFIRMED.**

**PITTMAN, C.J., BANKS, P.J., SMITH, MILLS, WALLER, COBB, DIAZ AND EASLEY, JJ., CONCUR.**