822 So.2d 1132 (2002)
Wanda Collier LACEY, Appellant,
v.
Charles Frank LACEY, Appellee.
No. 2001-CA-00879-COA.
Court of Appeals of Mississippi.
July 23, 2002.
*1133 Debra Lynn Allen, Jackson, attorney for appellant.
Edward C. Fenwick, Kosciusko, attorney for appellee.
Before SOUTHWICK, P.J., BRIDGES, and BRANTLEY, JJ.
SOUTHWICK, P.J., for the court.
¶ 1. Wanda C. Lacey filed a petition against her ex-husband, C. Frank Lacey, requesting that she be awarded physical *1134 custody of the couple's two children or, alternatively, requesting that she be awarded more definite visitation. Mr. Lacey filed a cross-petition requesting modification of visitation and child support. The chancellor restricted Mrs. Lacey's visitation and ordered her to pay $310 per month in child support. Mrs. Lacey appeals arguing that the chancellor erred in modifying visitation, erred in questioning Mrs. Lacey, and erred in ordering child support. We affirm.

STATEMENT OF FACTS
¶ 2. Wanda and Frank Lacey were granted an irreconcilable differences divorce on December 19, 1996. Mr. Lacey was granted physical custody of the couple's two children, ages four and one-and-a-half, at the time of the divorce. No visitation schedule was detailed in the couple's property settlement and child custody agreement. Mrs. Lacey was granted "reasonable visitation rights."
¶ 3. On January 26, 2001, Mrs. Lacey filed a petition for citation of contempt and for modification of custody. Mrs. Lacey alleged that since December 2000 Mr. Lacey had willfully refused to allow visitation with the two children in violation of the child custody agreement. The petition also alleged a material change in circumstance adverse to the welfare of the children and that it would be in the children's best interest to be placed in her custody. An amended petition alleged that Mr. Lacey "created a home environment which has endangered the physical and emotional well-being of the children." Mrs. Lacey requested she be awarded visitation as specified in her petition, if not awarded physical custody.
¶ 4. Three days later, Mr. Lacey filed his own petition for modification. Mr. Lacey's petition alleged that Mrs. Lacey "has engaged in a variety of behaviors which have endangered the children both physically and emotionally." Mr. Lacey requested that Mrs. Lacey be allowed only supervised visitation. Additionally, Mr. Lacey requested that Mrs. Lacey be ordered to pay child support equal to twenty-percent of her adjusted gross monthly income.
¶ 5. Two hearings were held in this matter. The first concerned Mrs. Lacey's request for an independent mental and physical examination of the couple's children and the appointment of a guardian ad litem. The chancellor denied these requests. The second hearing concerned the issues of contempt, custody, and child support.
¶ 6. At the second hearing, held on April 24, 2001, the only persons to testify were Mrs. Lacey and Mr. Lacey. At the time of this hearing, the daughter was nine, and the son was six.
¶ 7. Mrs. Lacey testified that at the time of the divorce she was in a drug rehabilitation center. After being discharged, Mrs. Lacey lived in four different places before finally settling in Brandon, Mississippi. Mrs. Lacey admitted that after discharge from rehabilitation she relapsed into using alcohol, marijuana, cocaine, crack, and crystal methamphetamine. She used these drugs from May 1996 until April 1999. When asked what prompted her to suddenly cease all drug use, Mrs. Lacey replied that "I was quite angry because the life as I knew in the drug world was the same, but I was different, you know, because I had been sober for six years and it took me a long time not to be so angry at myself." Mrs. Lacey explained that in 1999 she "was about to commit homicide because of all these people around me stealing my car, stealing my clothes, stealing all of my stuff that I knew I had to make a change in my life."
*1135 ¶ 8. Mrs. Lacey testified that she had been taking Paxil since shortly before the divorce in 1996. Mrs. Lacey testified that Paxil helped control her "anxiety and paranoia and rage." She testified that she believed her daughter to have similar problems. Mrs. Lacey testified that she offered her then six-year-old daughter a half-dose of Paxil because she thought her daughter was "in a mood," but her daughter was "smart enough from what she has been taught" not to take the pill. Mrs. Lacey stated that "it is pretty much thank goodness when I don't have enough reliability that, to make an adult decision ..." in regards to the offering of Paxil to her daughter. Mrs. Lacey also admitted that she had a "bong," a device used to smoke marijuana, in her house and that her daughter knew how it was used. When asked how her daughter could have acquired such knowledge, Mrs. Lacey admitted that her daughter probably saw her smoking marijuana.
¶ 9. Mrs. Lacey testified that she had been in a romantic relationship with Laura Farris since June 2000 and that Ms. Farris had lived with her since October 2000. Mrs. Lacey testified that she did housework topless when her children were present. She also stated that she would watch television in the nude. Mrs. Lacey proceeded in this manner even after Ms. Farris moved in with her and the children were also present. Mrs. Lacey stated that after Ms. Farris moved in that she did not change her habits although "it seemed like it was more of a problem with the children and I really didn't think much about it...." Mrs. Lacey stated that she now realized that the children were no longer babies and that "changes need to take place so that [my daughter] feels comfortable and safe because, you know, she is developing, you know, and I have to consider that." Mrs. Lacey testified that the children saw her when she was nude and in the bed with Ms. Farris. Mrs. Lacey also testified that she left an uncovered box of "sexual devices" on her bedroom floor and that the children saw them. Mrs. Lacey told the children that the box contained Halloween toys.
¶ 10. Mrs. Lacey stated that her daughter was at one time disturbed by her relationship with Ms. Farris but claimed her daughter no longer had a problem with it. Mrs. Lacey explained that she told her daughter that "Jesus loves me and Jesus loves you and he teaches us not to hate and all we can do is do what Jesus does." Mrs. Lacey objects that she was asked by the chancellor to explain how she was going to reconcile her explanation to her daughter with what the Bible stated about her present relationship if she was going to use it as a tool to set an example for her daughter.
¶ 11. The chancellor questioned Mrs. Lacey about an occasion when her children woke earlier than she and Ms. Farris did. Mrs. Lacey testified on that occasion she told the children to go play or get themselves something to eat while she and Ms. Farris remained in the bed, but the children continued to bang on the bedroom door. When asked why she did not pay attention to her children, Mrs. Lacey responded that "I was being selfish at that time and Laura goes to work on the weekends and I don't get to see her and it is a new relationship." Mrs. Lacey testified that during visitation at her parents' house that she, Ms. Farris, and the children would sleep in the same bed. Mrs. Lacey testified that her daughter did not like speaking with Ms. Farris whenever Ms. Farris called her parents' house during visitation. Mrs. Lacey also stated that since the divorce she had intimate relationships with three men and five women, including Ms. Farris.
*1136 ¶ 12. Mrs. Lacey testified that after the divorce her visitation with her children was sporadic. She testified that she would see the children every couple of months. For the past two years, Mrs. Lacey had visitation every other weekend. Mrs. Lacey testified that Mr. Lacey permitted her to have overnight visitation with the children, although he was aware that she was a lesbian and had continuing drug problems. Mrs. Lacey testified that she filed the contempt action because Mr. Lacey did not allow her visitation with the children during part of December and January. Mrs. Lacey testified that in December 2000 she had a confrontation with her exhusband about visitation because her daughter "didn't want to come to my house and he wasn't going to make her." It also appears that this was when Mrs. Lacey informed Mr. Lacey that Ms. Farris was living with her. Mrs. Lacey depended on her parents to get the children for visitation and return them afterwards.
¶ 13. Mrs. Lacey testified that she never checked on her children's progress in school until after the first hearing was held in this matter. Mrs. Lacey stated that she wanted custody of her children "[b]ecause they are my babies." She further stated that her children would have good schools and that "I would know their teachers and I would know their grades and I would know how their day went and I would know their clothes were clean...." Mrs. Lacey also testified that Ms. Farris would be able to help her with the children.
¶ 14. Mr. Lacey testified that after the Paxil and marijuana incidents, that he suspended visitation for one month afterwards each time and would then allow visitation to continue. Mr. Lacey testified that he was aware of Mrs. Lacey's relationship with Ms. Farris but did not interfere with visitation. Mr. Lacey testified that he stopped visitation after his daughter came home upset after seeing Mrs. Lacey nude in the bed with Ms. Farris and after seeing the "adult toys." Mr. Lacey explained that his daughter said she did not want to go back to Mrs. Lacey's house after that experience. Mr. Lacey told Mrs. Lacey that she could have visitation at her parents' home but that the children would not be staying at her home overnight.
¶ 15. Mr. Lacey stated that after the divorce, Mrs. Lacey would see the children perhaps once a month or once every two months. Mr. Lacey stated that he would allow his ex-wife to see the children at her parents' house or if she had a place of her own. Mr. Lacey stated that visitation had become more frequent and regular in the year-and-a-half prior to the hearing. Mr. Lacey stated that either he or Mrs. Lacey's parents would provide transportation for the kids from his home to the grandparents' home in Carthage.
¶ 16. The chancellor found that Mr. Lacey was not in contempt. Denying the request for physical custody, the chancellor granted Mrs. Lacey's request for specified visitation with her children but restricted overnight visitation to be conducted only at the home of her parents. The chancellor ordered that Mrs. Lacey's girlfriend not spend the night at the grandparent's home while the children were present. The chancellor ordered Mrs. Lacey to pay $310 per month in child support. The chancellor later entered a written judgment. This is Mrs. Lacey's appeal.

DISCUSSION

1. Visitation
¶ 17. Mrs. Lacey argues that the chancellor erred in restricting her to supervised visitation and erred in ordering that all visitation take place outside the presence of her girlfriend. Mrs. Lacey's romantic *1137 relationship with Laura Farris began in June of 2000, and Ms. Farris had lived with her since October of 2000.
¶ 18. The principal problem with these assignments of error is that the chancellor imposed no such restrictions on visitation. The chancellor ordered Mrs. Lacey's visitation take place at the home of her parents and that the children spend the night there during visitation. Mrs. Lacey's attorney specifically asked at the close of the hearing whether Mrs. Lacey was "allowed to take the children and go do what she wants with the children." The chancellor replied that Mrs. Lacey could take the children where she pleased during the day but that the children must spend the night at the grandparents' home. The chancellor's written judgment specifically stated that Mrs. Lacey could take the children on day trips. Also, the chancellor only ordered that Ms. Farris not spend the night with Mrs. Lacey and the children and that the children could not be taken to Ms. Farris' home when Ms. Farris was present. The chancellor stated, in response to a question by Mrs. Lacey, that Ms. Farris could visit with the children.
¶ 19. We will, however, examine the actual restrictions that the chancellor imposed. "The chancellor has broad discretion when determining appropriate visitation and the limitations thereon." Harrington v. Harrington, 648 So.2d 543, 545 (Miss.1994). "When the chancellor determines visitation, he must keep the best interest of the child as his paramount concern while always being attentive to the rights of the non-custodial parent, recognizing the need to maintain a healthy, loving relationship between the non-custodial parent and his child." Harrington, 648 So.2d at 545. If there has been no "evidence presented that a particular restriction on visitation is necessary to avoid harm to the child," then "the chancellor's imposition of a restriction on a non-custodial parent's visitation is manifest error and an abuse of discretion." Id.
¶ 20. In Harrington, the chancellor ordered that the father not be allowed overnight visitation with his children, that the father's girlfriend not be allowed in the presence of the children, and that the father not speak of his relationship with his girlfriend to the children. Id. at 544. The chancellor based his decision on the basis that the father was not married to the girlfriend, that the father's daughter did not approve of the relationship, and that the girlfriend spoke "harshly" to the children on two separate occasions. Id. at 546. The Supreme Court found that the chancellor abused his discretion in setting forth these restrictions on the visitation of the father. Id. at 547. The Supreme Court stated that "[t]he better course of action would be that [the girlfriend] did not stay overnight in the home with the children during that visitation." Harrington, 648 So.2d at 548.
¶ 21. The Supreme Court has found that a chancellor's order that a mother only exercise her right to visitation outside the presence of her girlfriend is not an abuse of discretion. White v. Thompson, 569 So.2d 1181, 1185 (Miss. 1990). In a later case, the Supreme Court found that a chancellor abused his discretion when he restricted a father to visitation with his children outside the presence of his girlfriend. Dunn v. Dunn, 609 So.2d 1277, 1286 (Miss.1992). The Supreme Court noted that there was "no evidence presented that visitation in the mere presence of a lover of [the father] would be detrimental to the children or dangerous in any way." Dunn, 609 So.2d at 1286. The Supreme Court also reiterated that an "`extramarital relationship is not, per se, ...'" harmful to a child *1138 "`whether such [parental] behavior is immoral or not....'" Id. (citations omitted)
¶ 22. The Supreme Court has also reversed similar restrictions where the only harm alleged to the child was embarrassment at and disapproval of the father's homosexual lifestyle. Weigand v. Houghton, 730 So.2d 581, 587 (Miss.1999). However in that case, the Supreme Court placed some emphasis on the fact that the child was fifteen years of age which would have allowed the child "considerable input as to visitation and it seem[ed] obvious that [the child] wishes to continue the same arrangement." Id. Such is not the case here where the children are nine and six.
¶ 23. The restrictions here are that Mrs. Lacey may have overnight visitation with her children but only at the home of her parents and that Ms. Farris may not spend the night with Mrs. Lacey and the children. The other restriction is that Mrs. Lacey may not take the children to Ms. Farris' home. These restrictions are consistent with what was suggested as permissible by the court in Harrington and slightly less restrictive than those allowed in White.
¶ 24. There is substantial evidence in the record that it was more than just the daughter's confusion as to the nature of her mother's relationship with and dislike of Ms. Farris that justified the visitation restrictions. The chancellor cited the children's exposure to the "sexual relationship when the children found her in the bed with Laura when she was nude" as well as the children's discovery of the adult toys left in plain view by the mother. Mrs. Lacey, Ms. Farris, and the children shared the same bed when visiting with the grandparents. The chancellor cited the fact that Mrs. Lacey often walked around the house nude in the presence of the children and her girlfriend. The chancellor also cited the children's awareness of their mother's sexual relationship with two other women since the 1996 divorce. Unlike Dunn, evidence was presented that overnight visitation with Mrs. Lacey's girlfriend or visitation in the girlfriend's home was detrimental to the children due to the children's exposure to the sexual nature of the relationship between Mrs. Lacey and Ms. Farris.
¶ 25. Additionally, there is in the record substantial evidence that Mrs. Lacey exposed two very young children to drugs and drug paraphernalia. A nine-year-old girl had knowledge of a "bong." The chancellor was disturbed that Mrs. Lacey offered medication to a child because she believed the child to be in a "mood." It is evident that the chancellor was also concerned with Mrs. Lacey's emotional difficulties which Mrs. Lacey referred to as "anxiety, paranoia, and rage."
¶ 26. Based on the evidence in the record, we cannot say that the chancellor abused his discretion in restricting visitation.

2. Examination of Mrs. Lacey by the Court
¶ 27. Mrs. Lacey assigns as error the chancellor's questioning of her. Mrs. Lacey alleges that the chancellor "questioned her incessantly, using leading questions and with much of the questioning regarding matters which were irrelevant and immaterial." A review of the transcript reveals that the chancellor questioned Mrs. Lacey about her drug use, her work history, her relationships after the divorce, her relationship with Ms. Farris and its effect on her daughter, the reasons for which she was taking Paxil, and the visitations missed since December of 2000. The chancellor also questioned Mrs. Lacey about Mr. Lacey's sobriety. These matters *1139 are highly relevant and material to the issues of custody, visitation, and contempt.
¶ 28. The rules of evidence allow the chancellor to question witnesses. See M.R.E. 614(b). An objection must be made if it is felt that such questioning is improper. See M.R.E. 614(c). The Supreme Court has found that failure to object at trial to the questioning of a witness by the court is a waiver of the issue on appeal. Ekornes Duncan v. Rankin Med. Ctr., 808 So.2d 955, 961 (Miss.2002). As no objection was made at the hearing, we find this issue to have been waived.

3. Child Support
¶ 29. Mrs. Lacey's final assignment of error arises from the chancellor's order that she pay child support. The parties agreed at the time of divorce that Mrs. Lacey would pay no child support. The agreement, incorporated into the judgment of divorce, stated that "both parties desire... to make adequate provision ... for the custody and support of their minor children." No provision was made for child support in the agreement. The parties made this agreement because at that time Mrs. Lacey was in drug rehabilitation and unemployed.
¶ 30. "A chancellor is afforded broad discretion in the area of modification of child support and this Court will reverse only when the chancellor was manifestly in error in a finding of fact or if there has been an abuse of discretion or when an erroneous legal standard was applied." Lahmann v. Hallmon, 722 So.2d 614, 622 (Miss.1998). The chancellor found that Mrs. Lacey was now employed and had a monthly adjusted gross income of $1,566. According to the child support guidelines, Mrs. Lacey would be required to pay twenty percent of that amount or approximately $310 per month. Miss.Code Ann. § 43-19-101(1) (Rev.2000). What the chancellor did not do, and this is the alleged error, is find that a material change of circumstances occurred since the divorce that justified the imposition of child support.
¶ 31. The general rule is that a final divorce decree may be modified only upon a showing of a substantial or material change in the circumstances of the father, the mother, or the children, arising subsequent to the entry of the decree to be modified. Sumrall v. Munguia, 757 So.2d 279, 282 (Miss.2000). The proponent of a modification has the burden of demonstrating a material change in circumstances. Wallace v. Bond, 745 So.2d 844, 849 (Miss. 1999). The circumstances that cause the material change must not have been reasonably foreseeable when the earlier decree was entered. Wallace, 745 So.2d at 848-49. Mr. Lacey argues that because Mrs. Lacey was not ordered to pay child support under the original decree, that the chancellor's award should be viewed as an initial award of child support, not a modification, and therefore no finding of a change in circumstances was required. We view the issue somewhat differently but agree with the result.
¶ 32. It has been held that "a decree indicating that no child support should be paid is unusual, [but] such decrees are inherently modifiable upon a showing of a material change in circumstances." Mississippi Dept. of Human Servs. v. Shelby, 802 So.2d 89, 96 (Miss. 2001). Why such a showing was required in Shelby is instructive. In that case, the mother and father agreed "in the divorce decree that the father would not pay child support in consideration for relinquishing his equity in the marital home to the wife." Shelby, 802 So.2d at 91. The decree also noted that the father's income was such *1140 that "the child support statutory guidelines would be inappropriate and that [the father's] wages should be exempted from withholding...." Id.
¶ 33. Later, the mother sold the house, and petitioned for a modification of child support after learning the father had obtained better paying employment. Id. The chancery court did not grant modification of child support since it found that the mother had failed to prove a material change in circumstances. Id. After the mother failed to appeal that order, the Department of Human Services later filed on the mother's behalf a motion seeking to have the order denying the modification set aside and also filed a complaint for support. Id. at 91-92. Both the motion and a request for summary judgment by the Department of Human Services were denied after the chancellor found no material change in circumstances. Shelby, 802 So.2d at 92.
¶ 34. The Supreme Court affirmed the chancellor's decision. The Court noted, after finding the complaint for support was barred by the doctrine of res judicata, that it was dealing with a "collateral attack on the decree under Rule 60" and that the "claim is that the judgment [was] void as against public policy." Id. at 96, referring to M.R.C.P. 60(b). The decree was "not void as against public policy for its failure to require the non-custodial parent to pay periodic child support." Id. at 96. The Court further explained that "approval of the original agreement was based upon an assessment of conditions as they existed at that time" and that "[t]he terms of child support were then and continue to be modifiable upon a showing of a material change in circumstances warranting such a change in the best interest of the child." Id. The Court noted that the mother failed to demonstrate, "to the satisfaction of the chancellor," a material change in circumstances. Id.
¶ 35. Unlike in Shelby, here the parties did not originally agree that other arrangements would be adequate and child support would not be needed unless the custodial parent became unemployed. Instead, the non-custodial parent, Mrs. Lacey, was unemployed and because of various problems did not appear likely to be in a position to be providing support. Support may well have been needed, but it was unavailable.
¶ 36. The concept of modification of child support only if a material change of circumstances has occurred since the date of the earlier order, has no application to a situation such as this. Both the custodial and non-custodial parents are obligated "to provide financially for his or her children, given his or her resources and opportunities." Cumberland v. Cumberland, 564 So.2d 839, 845 (Miss.1990). The statutory presumption is that the noncustodial parent will provide support and it will be in a specific percentage of adjusted gross income. Miss.Code Ann. §§ 43-19-101(1) (Rev.2000) and 43-19-101(2) (Rev.2000). Thus, a rebuttable presumption exists in this case that Mrs. Lacey as the non-custodial parent is required to provide her two children with twenty-percent of her adjusted gross income or $310 per month.
¶ 37. When it is evident that the non-custodial parent was exempted from a support obligation at the time of an earlier court order only because of being unemployed, there is no logic to requiring proof that this parent's later obtaining of employment is a material change in circumstances. That is semantics without substance. In such a situation, it is justified to modify the earlier decree and require support consistent with the statute that sets out the guidelines.
*1141 ¶ 38. THE JUDGMENT OF THE CHANCERY COURT OF ATTALA COUNTY IS AFFIRMED. COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
McMILLIN, C.J., BRIDGES, THOMAS, LEE, MYERS, CHANDLER AND BRANTLEY, JJ., CONCUR. KING, P.J., CONCURS IN RESULT ONLY. IRVING, J., NOT PARTICIPATING.