# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2012-CT-00711-SCT

*DENISE J. IRLE*

*v.*

*PATTY FOSTER AND LAVIRL FOSTER*

### ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 03/14/2012 |
| TRIAL JUDGE: | HON. TALMADGE D. LITTLEJOHN |
| TRIAL COURT ATTORNEYS: | GREGORY E. BEARD |
| | BRIAN L. STARLING |
| | JONATHAN W. MARTIN |
| | ALLISON E. WORLEY |
| COURT FROM WHICH APPEALED: | PRENTISS COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | JOHN A. FERRELL |
| ATTORNEY FOR APPELLEES: | GREGORY E. BEARD |
| NATURE OF THE CASE: | CIVIL - CUSTODY |
| DISPOSITION: | AFFIRMED - 10/08/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**DICKINSON, PRESIDING JUSTICE, FOR THE COURT:**

¶1. In this custody battle between a child's mother and grandparents, the chancellor heard evidence that the child's mother was sexually promiscuous, that she had failed drug tests, and that she planned to move with the child to Chicago to live with a convicted sex-offender. The chancellor also heard evidence to the contrary. Based on this evidence, and judging the credibility of the witnesses before him, the chancellor found that the natural-parent presumption had been overcome and, after conducting a proper *Albright* analysis, that the

best interests of the child would be served by granting custody to the grandparents.[1]  We affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     Denise Irle and David Foster were never married but had two children—Britney and Chase.  David served as the children's primary caretaker until Britney was ten and Chase was eight.  But after David passed away, the children went to live with Irle.  At that point, Patty and Lavirl Foster—David's parents—petitioned the chancery court for custody of both children, and the chancellor entered an agreed order giving Irle custody of Britney and the Fosters custody of Chase.  Then the Fosters learned that the Department of Human Services had removed Britney from Irle's home, so they returned to the chancery court seeking custody of her as well.

¶3.     The chancellor awarded the Fosters temporary custody, appointed a guardian ad litem, and held a hearing, after which he held that the Fosters had presented sufficient credible evidence to overcome the natural-parent presumption, and that Britney's best interests would be served by awarding custody to the Fosters.  Irle appealed, and the Mississippi Court of Appeals affirmed, finding that the evidence supported the chancellor's decision.  The Court of Appeals specifically rejected Irle's argument that the chancellor also should have considered whether a material change in circumstances had occurred since the original custody order was entered.

---

[1] *Albright v. Albright*, 437 So. 2d 1003 (Miss. 1983).

¶4. We granted certiorari and affirm the judgment of the chancellor. And although we agree with the result reached by the Court of Appeals, we find that the chancellor was required to—and did—consider whether a material change in circumstances had occurred.

**ANALYSIS**

¶5. We will reverse a chancellor's custody determination "if it was manifestly wrong or clearly erroneous, or if the chancellor applied an erroneous legal standard."[2] That is, the chancellor must apply the correct law and his ruling must be supported by credible evidence.[3] Here, he did and it was.

## I. The Legal Standard at Issue

¶6. This case presents a custody battle between Britney's grandparents and natural mother, all who previously had agreed with a court order awarding custody to the mother. The central question presented is what the grandparents were required to prove to wrestle custody away from the mother. It is well-settled that third parties—such as the Fosters in this case—must overcome the law's presumption that custody should remain with a natural parent because they do not stand on equal footing with the mother.[4] The question is how this may be accomplished.

---

[2] *Smith v. Smith*, 97 So. 3d 43, 46 (Miss. 2012) (citing *Johnson v. Gray*, 859 So. 2d 1006, 1012 (Miss. 2003)).

[3] *In re Dissolution of Marriage of Leverock & Hamby*, 23 So. 3d 424, 427 (Miss. 2009) (citing *K.D.F. v. J.L.H.*, 933 So. 2d 971, 976-77 (Miss. 2006)).

[4] *Rodgers v. Rodgers*, 274 So. 2d 671, 673-74 (Miss. 1973)

3

¶7.    Whatever doubt there may be about the grandparents' burden, it is universally understood and accepted that a natural parent seeking to modify custody must demonstrate some change in the circumstances that were presented to the chancellor that led to the previous decree, and must show that the changed circumstances are material.[5]

¶8.    But thirty-five years ago in ***Thomas v. Purvis***, this Court stated that "[t]he principle that there must be a material change of circumstances which adversely affects a child's welfare before a custody decree may be modified only applies between parents of the child."[6] For two reasons, we find this sweeping statement needs clarification and correction.

### *The Error in this Court's Precedent*

¶9.    First, ***Thomas*** cited ***Rodgers v. Rodgers*** as authority for the broad proposition that a material change in circumstances must be demonstrated only in cases involving natural parents.[7] But nothing this Court said in ***Rodgers*** supports this proposition. The chancellor in that case—after concluding that a material change in circumstances had occurred, but without considering the natural-parent presumption—modified an original divorce decree to transfer custody of a minor child from the child's natural mother to the child's paternal grandparents.[8] The mother appealed, arguing that she enjoyed the natural-parent

---

[5] ***Tucker v. Tucker***, 453 So. 2d 1294, 1297 (Miss. 1984).

[6] ***Thomas v. Purvis***, 384 So. 2d 610, 612 (Miss. 1980).

[7] ***Id.*** (citing ***Rodgers***, 274 So. 2d at 673).

[8] ***Rodgers***, 274 So. 2d at 672.

presumption, and that the grandparents had presented insufficient evidence to rebut that presumption.[9]

¶10.   This Court agreed with the mother, recognizing that a natural parent may not be deprived of custody in favor of a third party unless the third party rebuts the natural-parent presumption by clear and convincing evidence.[10]  The ***Rogers*** Court certainly did not intend to place a burden on a natural parent that it did not place on third parties, thereby making it more difficult for the natural parent to prevail in a custody battle.  Stated another way, if a natural parent is required to demonstrate a material change in circumstances in order to win custody, then certainly a third party has at least that same burden.

¶11.   Importantly, the ***Rodgers*** Court reversed solely because the grandparents failed to rebut the natural-parent presumption, and it never considered or discussed whether the grandparents did or did not have an additional burden to show a material change in circumstances.[11]

### *The Factual Differences*

¶12.   Unfortunately, it is not uncommon for natural parents to engage in numerous custody battles.  But rarely do third parties—such as grandparents—attempt more than once to take custody from natural parents.  This led to the second error in the ***Thomas*** Court's reasoning, which was that it had failed to consider that there would be rare cases—such as the one

---

[9] ***Id.*** at 673.

[10] ***Id.*** at 673-74.

[11] ***Id.***

5

before us today—where the third parties seeking to take custody from natural parents already had been before the court in a previous custody battle. So, while the logic is obvious that the material-change-in-circumstances test does not apply to third parties appearing for the first time before the chancery court, the same cannot be said where, as here, grandparents previously have been before the court on the very issue of who should have custody. Stated another way, grandparents who already have been before the chancery court in an attempt to remove custody from a natural parent may not reappear before the same chancery court, seeking a change in custody based on the same evidence and circumstances as existed when they first appeared.

¶13. So we hold that in cases involving a third party and a natural parent—where the third party has been before the court in a previous custody dispute over the child—the material-change-in-circumstances test applies. A third party attempting to take custody from a natural parent under those circumstances is required to overcome the natural-parent presumption and to show a material change in circumstances from the previous decree.

¶14. Said differently, to obtain custody, the Fosters had to prove: (1) that a material change in circumstances had occurred since they last appeared before the chancellor; (2) that the natural-parent presumption had been rebutted; and (3) that the best interests of the child would be served by granting them custody. The chancellor applied this standard and credible evidence supported his judgment.

¶15. Justice Pierce's dissent points out the troubling misconception among some members of the chancery bench and bar who are of the view that agreed custody orders somehow

6

lessen a chancellor's duty to adjudicate the best interests of the child. We take this opportunity to reinforce the rule that agreed orders do not diminish in any way a chancellor's duty to make a determination of what is in the best interests of the child. And agreed orders do not constitute exceptions to the requirement of a material change in circumstances for modifications of custody orders. *A.M.L. v. J.W.L.*, 98 So. 3d 1001, 1013–16 (Miss. 2012). As we have said numerous times, "the paramount and ultimate goal in *every* child custody case must be the best interests of the child."[12]

## II. The chancellor applied the correct legal standard, so his factual findings must be afforded deference.

¶16. First, we note that, under both the Mississippi Rules of Civil Procedure and the Uniform Chancery Court Rules, the chancellor is under no obligation to provide specific findings of fact unless a party requests that he do so.[13] No such request appears in the record. And we have acknowledged specifically that this rule applies in child-custody cases.[14]

¶17. But in this case, the learned chancellor did make findings of fact that are clearly set forth in his order and bench ruling. His order stated "this Court . . . finds that a material and substantial change in circumstances has occurred which adversely effects [sic] the minor children . . . ." So, clearly, the chancellor found that the material-change-in-circumstances

---

[12] *Vaughn v. Davis*, 36 So. 3d 1261, 1264 (Miss. 2010) (quoting *In re Dissolution of Marriage of Leverock and Hamby*, 23 So. 3d 424, 429 (Miss. 2009)).

[13] Miss. R. Civ. P. 52; Miss. Unif. Chancery Ct. R. 4.01.

[14] *Blevins v. Bardwell*, 784 So. 2d 166, 174 (Miss. 2001).

requirement applied and had been met, and a careful reading of his bench ruling reveals facts upon which he based his finding:

> The other factor, of course, is this matter of moving, is that a factor to be considered. The Court does not find that simply because she's moving that constitutes necessarily a *material change in circumstances*. As I said, that's her privilege under **Bell v. Bell**[, 572 So. 2d 841, 845 (Miss. 1990)]. But what concerns this Court is by the testimony of the daughter today, they would be living with—number one, they're moving to Chicago. Well, enough said. Secondly, they would be living with a couple, Uncle Eric or whatever his characterization is, and Aunt Andrea, who have never saw fit to benefit themselves by the cloak of marriage. And so the little girl testified today, they would be living with them if they went up there, exposing again, the mother has shown here, as the child had testified to and I believe her, that she would be exposed to living in a household where the people live—the female and the male live without the benefit of lawful wedlock. And this, to me, is not in the best interest of the child in respect to the move. But I realize the moving per se is not a controlling factor in determination of custody.[15]

¶18. This entire analysis is couched as a material-change analysis. The chancellor begins by noting that the mother's new intention to move is, standing alone, insufficient to constitute a material change, but that it reaches that level because of the surrounding facts.

¶19. Likewise, the chancellor made explicit findings on the other two relevant criteria in both his written order and his bench ruling. In the written order, he stated "this Court finds that the defendant is morally unfit to have custody of the minor child . . . ." In the bench ruling, he stated: "This Court does hereby find that the mother is morally unfit to claim the benefit of the natural parent presumption" and that "this Court finds that [Britney's] best interest, that the polestar consideration of this Court is that the custody, primary physical custody of that child be awarded to the paternal grandparents."

---

[15] (Emphasis added.)

### III. Credible evidence supported the chancellor's judgment.

¶20.    We must afford the chancellor's findings deference and consider only whether credible evidence supports those findings.[16]   Here, the evidence amply supported the chancellor's findings that a material change in circumstances had occurred, that the Fosters had rebutted the natural-parent presumption, and that the minor child's best interests were served by awarding the Fosters custody.

¶21.    As discussed above, the chancellor's material-change analysis focused on Irle's intent to move to Chicago with the minor child.  The chancellor heard conflicting testimony about where Irle and the child would reside, but the minor child testified that they would reside with Eric Brock.  Brock has been convicted for sexually abusing a child.

¶22.    The chancellor, exercising a power that lies with him alone, judged the credibility of the witnesses and determined that he believed the minor child over the conflicting evidence.[17] We must accept that credibility determination.  And no reasonable person can argue that a mother's intent to move her child into the home of a sex-offender—especially one whose victim was a child—does not constitute a material change and moral unfitness rebutting the natural-parent presumption.

---

[16] *In re Dissolution of Marriage of Leverock & Hamby*, 23 So. 3d at 427 (citing *K.D.F.*, 933 So. 2d at 976-77).

[17] *Murphy v. Murphy*, 631 So. 2d 812, 815 (Miss. 1994) (citing *West v. Brewer*, 579 So. 2d 1261, 1263-64 (Miss. 1991); *Rice Researchers, Inc. v. Hiter*, 512 So. 2d 1259, 1265 (Miss. 1987); *Polk v. Polk*, 559 So. 2d 1048, 1049 (Miss. 1990)) ("A chancellor sits as a fact-finder and in resolving factual disputes, is the sole judge of the credibility of witnesses.").

9

¶23. In the dissent's opinion, "the testimony shows that Irle planned to move to the Chicago area, but that she planned to live with her sister Nora Jefferson." But we do not reverse trial judges simply because our opinions differ. Trial judges enjoy a deferential standard, and we reverse them only where their views are unsupported by evidence. Here, the dissent acknowledges that Britney provided testimony that they planned to live in the same home as Brock. The chancellor was persuaded by this testimony and, with respect, the dissent is without authority to decide what "the [disputed] testimony shows." That power lies with the chancellor alone, who sat as the fact-finder and heard the testimony firsthand.

¶24. And the same is true of the dissent's view that the material change had been remedied because "Irle testified that she had no plans to live in the same home as Brock." That testimony did not remedy the material change because the chancellor found that the witness who provided that testimony lacked credibility, and he did not believe her testimony to be true.

¶25. The chancellor provided other findings that also support his ruling:

> I have observed the demeanor of the witnesses on this witness stand throughout these hearings. And Ladies and Gentlemen, that is very important in this case. I have seriously considered the demeanor of these witnesses as they've each one testified in this case, and some have not been impressive to me.

> [The] court so finds under this case that even going back—this was brought out in the trial of this case and unobjected to by the parties—that she has four out-of-wedlock children. That the boyfriend, Mr. Voyles—Plowboy, I believe, was his name—I almost called him Playboy. He was the one who occasionally visits with him or she came over to see him with these two children, spent the night there. She said there's no sexual involvement and he did, too. But, you know, Mr. Voyles was as nervous as a cat on a hot tin roof when he testified here.

10

It's interesting to me, as a matter of comment, that the mother this morning testified that they got their divorces the same day from their respective spouses. No wonder he was nervous on the witness stand that day. They both got their divorces from their respective spouses, as evidenced by her testimony here today, and it was brought out in the proof, March 6, 2012, after this case had been recessed for a period of time.

Furthermore, this Court finds that she has actually failed one drug test, a cocaine test administered in October of 2011, by the guardian ad litem. Even though, admittedly, she passed the one the next day when she hired a separate firm to do it. She was visiting with and taking the children in the presence of a married man while she was still married to another man.

This Court find[s] that she's morally unfit to claim the benefit of this natural parent presumption.

[T]hey would be living with a couple, Uncle Eric or whatever his characterization is, and Aunt Andrea, who have never saw fit to benefit themselves by the cloak of marriage. And so the little girl testified today, they would be living with them if they went up there, exposing again, the mother has shown here, as the child had testified to and I believe her, that she would be exposed to living in a household where the people live—the female and the male live without the benefit of lawful wedlock.

Considering these facts, we conclude that credible evidence supports the chancellor's judgment.

## CONCLUSION

¶26.    Because the chancellor applied the correct legal standard and his factual findings were supported by credible evidence, we affirm the judgment of the Chancery Court of Prentiss County.  Accordingly, we also affirm the judgment of the Court of Appeals.

¶27.    **AFFIRMED.**

**RANDOLPH, P.J., LAMAR, KITCHENS AND COLEMAN, JJ., CONCUR. PIERCE, J., CONCURS IN PART AND IN RESULT WITH SEPARATE WRITTEN OPINION JOINED BY CHANDLER, J.; RANDOLPH, P.J., JOINS IN PART.**

11

**WALLER, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, J.**

**PIERCE, JUSTICE, CONCURRING IN PART AND IN RESULT:**

¶28.    I concur in part and in result with the majority. Custody battles between natural parents and custody battles between natural parents and third parties cannot be boxed together in a neat package for judicial resolution.  They are *horses of different colors*.

¶29.    At no time prior to the matter before us today had the natural-parent presumption enjoyed by Irle in relation to Britney been litigated. True, an agreed order had been entered leaving Britney with her mother, but the agreed order did not contain a finding regarding the natural-parent presumption. Thus, Irle still enjoyed the natural-parent presumption. In the case before us today, then, when the Fosters filed their current petition they first had to overcome the natural-parent presumption. After a review of the record and based on our standard of review, I agree with the majority that the chancellor's finding that the natural parent presumption had been overcome should be affirmed.

¶30.    The next step for the chancellor was to determine whether it was in the best interest of the child to change custody to the Fosters (the third party). In my opinion, after piercing the natural-parent presumption, the chancellor should review the "totality of the circumstances" and make an appropriate finding. The Court of Appeals determined that an *Albright* [18]analysis must be employed. In my opinion, *Albright* is best applied between natural parents. The "totality of the circumstances" test certainly can rely on *Albright* but is not restricted thereto. In this case, using the "totality of the circumstances" test, and based

---

[18]    ***Albright v. Albright***, 437 So. 2d 1003 (Miss. 1993).

on our standard of review, I agree with the majority that the judgment of the chancellor should be affirmed.

¶31.    The majority's test is that for a third party to obtain custody, three requirements must be met: "(1) that a material change in circumstances had occurred since they last appeared before the chancellor, (2) that the natural-parent presumption had been rebutted, and (3) that the best interests of the child would be served by granting them custody." Had the natural-parent presumption been previously litigated or addressed in the agreed judgment, I would have joined the majority in full. However, that did not occur.

¶32.    I further disagree with the majority that there is a "misconception among some members of the chancery bench and bar who are of the view that agreed custody orders somehow lesson a chancellor's duty to adjudicate the best interest of the child."  In my experience, the majority's assertion is erroneous. Nevertheless, the safety and well-being of children in situations similar to Britney's are too important for a "bright-line" test to be used simply because an agreed order was submitted in some prior proceeding. The burden to overcome the natural-parent presumption is high. But, once it is overcome, our chancellors should be free to review the "totality of the circumstances" to determine if the best interest of the child is served to change custody in favor of a third party.

    **CHANDLER, J., JOINS THIS OPINION.  RANDOLPH, P.J., JOINS THIS OPINION IN PART**.

    **WALLER, CHIEF JUSTICE, DISSENTING:**

¶33.    I fully support and concur with the majority's holding that clarifies the requirements for a modification of custody between a parent and a third party, such as a grandparent.

13

However, I do not believe that the chancellor in this case was presented with sufficient evidence of a material change in circumstances for the thirty-five days that passed from the agreed order to the petition for modification. Even giving the Fosters the benefit of the doubt on all charges supporting their petition for modification, there still is insufficient proof to rebut the strong presumption that it is in the child's best interest to remain with a natural parent. Accordingly, I respectfully dissent.

### *Material Change of Circumstances*

¶34. In his written opinion, the chancellor found a material change in circumstances but never articulated what facts constituted that change. In his more detailed bench opinion, the chancellor never addressed any intervening change, but instead began his analysis by determining that Irle had lost the natural-parent presumption.

¶35. The Fosters argued before the chancellor that a material change in circumstances arose after the February 18, 2011, agreed order when Irle sent Britney to Kentucky, where she allegedly stayed with Irle's sister, Andrea Fore, and her live-in boyfriend, Eric Brock, who had been indicted for sexually abusing a minor. The Fosters further alleged that, while Britney was in Kentucky, Irle went on a multi-day drug binge and subsequently wrecked her van with one of her other children inside the vehicle. This alleged episode resulted in the Department of Human Services (DHS) taking Britney from Irle and temporarily placing her with the Fosters while it conducted an investigation. However, DHS found no evidence of impropriety and returned custody to Irle.

14

¶36.   There was no testimony at trial that Britney stayed with Brock while in Kentucky.  In fact, the only testimony that Britney had ever been around Brock was from Britney. She testified that, on a previous trip to Kentucky, where she was accompanied by her mother and her uncle Robert Irle, she stayed with her aunt and Brock, but that she was never left alone with Brock.[19]

¶37.   More disconcerting though, is the Fosters' allegation that Irle planned to move in with Fore and Brock after moving to Chicago. While a mere move out of state does not constitute a material change in circumstances, additional factors may render such a move an adverse material change and could even rise to the level of rebutting the natural-parent presumption. *See* **Giannaris v. Giannaris**, 960 So. 2d 462, 468 (Miss. 2007) (providing that a mere move of a parent does not constitute a material change). Here, the testimony shows that Irle planned to move to the Chicago area, but that she planned to live with her sister Nora Jefferson. Fore testified that the plan was never for Irle and Britney to live with them after the move. She stated that the plan had always been for Irle and Britney to live with Jefferson and her family.  Jefferson confirmed this, testifying that if Irle retained custody, Irle and Britney would move to Hammond, Indiana, outside Chicago, to live with her. Irle also testified that this was her intention if she retained custody of Britney, adding that Britney

---

[19] It is unclear from the record when this visit actually took place. Britney initially testified that it was after February 2011, but then later testified that she did not actually remember when this trip took place, but that it may have been in 2010.The record indicates that, during the Kentucky visit that the parties agree took place after February 18, 2011, Fore and Brock already had moved to Chicago. It therefore seems that this other Kentucky trip, in which Britney stayed with Fore and Brock, was sometime before February 18, 2011, possibly in 2010. It also is not clear whether Brock had been indicted at that time.

would not be around Brock if they moved and that certainly she would not live in the same house as Brock.

¶38. The only testimony to the contrary was from Britney, who was twelve years old at the time of trial. She testified that she believed they would stay with Fore and Brock if they moved to Chicago. There was no other evidence or testimony that Irle planned such a move.

¶39. Indeed, the record reveals through the testimony of the Fosters that they largely filed this complaint because they were afraid Irle would move to the Chicago area, taking Britney with her. Patty Foster, Britney's paternal grandmother, testified that Britney had been well-cared-for in Irle's custody and that their current visitation schedule worked well. But, Patty added, she thought Irle needed help with her alleged drug problem, and she did not want Britney to grow up to be like Irle, whom she described as "liv[ing] off the state, food stamps, and the government." Patty also testified, however, that she did not fear for Britney's well-being while in Irle's custody, but that she did not like the fact that Irle seemingly had a number of male companions. Yet, on at least one occasion after February 18, 2011, Patty asked Irle to babysit another of Patty's deceased son's children of whom the Fosters had custody. Additionally, when pressed on cross-examination, Patty testified the reason Irle should not have custody of Britney was that Irle would "move up north" and take Britney with her.

¶40. Lavirl Foster, Britney's grandfather, testified that Irle should not have custody because she would move to Chicago and live with a "pedophile." He further testified that, "the part I'm afraid of is Irle leaving the state" and that there was no danger in Irle retaining custody

16

if she remained in Mississippi. Lavirl stressed that his concern was about her going to Chicago, stating that, even if Irle was ordered to stay away from Brock, she did not have sufficient funds and that she and Britney would end up living in a bad neighborhood.

¶41. But, as noted above, a mere move out of state, by itself, does not constitute a material change in circumstances adverse to the child, much less such a significant change that would call into question the natural-parent presumption. *See Giannaris*, 960 So. 2d at 468; *Grant v. Martin*, 757 So. 2d at 264, 266 (Miss. 2000) (noting that natural parents enjoy a strong presumption regarding custody).

¶42. Moreover, the chancellor did not consider whether the issue of living with Brock was moot. A custody "modification should not be ordered if a material change has been remedied." Deborah H. Bell, *Bell on Mississippi Family Law* § 12.11 (5)(a), 396 (2d ed. 2011); *see also Ruth v. Burchfield*, 23 So. 3d 600, 606 (Miss. Ct. App. 2009). Irle testified that she had no plans to live in the same home as Brock. Additionally, the chancellor has the authority to ensure that remedy remains intact. This means the chancellor can and should consider providing safeguards or restrictions regarding Britney's residing in the same home as, and exposure to, Brock.

¶43. The DHS inquiry revealed no impropriety, abuse, or neglect. After the investigation, full primary physical custody was returned to Irle.

¶44. Further, the chancellor did not find any actual adverse effect on Britney regarding any of the alleged changes in circumstances. The rule requires a finding of a material change in circumstances that "clearly posits or causes danger to the mental or emotional well-being of

a child . . . ." ***Giannaris***, 960 So. 2d at 468. That is not to say, however, that a chancellor must always wait for the child to suffer actual harm before modifying custody. Where a custodial environment is dangerous and clearly adverse to the child's best interests, a chancellor is not precluded from modifying custody just because somehow the child "appears to remain unscarred by his or her surroundings . . . ." ***Riley v. Doerner***, 677 So. 2d 740, 744 (Miss. 1996). Here, there was no evidence that Britney was in any actual danger. And to the extent there was a potential danger, that threat – living with Brock – had been remedied. *See* ***Ruth***, 23 So. 3d at 606; Deborah H. Bell, *Bell on Mississippi Family Law* § 12.11 (5)(a) (2d ed. 2011). While I agree with the majority that the chancellor is entitled to deference in his interpretation of the facts, I do not believe that substantial credible evidence supports a finding that a material change in circumstances occurred that would warrant a modification of custody. Rather, the weight of the evidence indicates that Britney would not have unsupervised, if any, contact with Brock.

### *Natural-Parent Presumption*

¶45.    Natural parents, as a general rule, have a right to custody of their children. ***Simpson v. Rast***, 258 So. 2d 233, 236 (Miss. 1972). There is a "strong presumption that a natural parent's right to custody is superior to that of third parties," including grandparents. ***Grant***, 757 So. 2d at 266. To overcome this presumption, there must be a clear showing that the parent has (1) abandoned or deserted the child, (2) the parent is unfit mentally or otherwise, or (3) the parent's conduct is so immoral as to be detrimental to the child. ***Barnett v. Oathout***, 883 So. 2d 563, 567 (Miss. 2004) ("Absent clear proof of one of the above

18

circumstances, the natural parent is entitled to custody of his or her child."); *Rodgers v. Rodgers*, 274 So. 2d 671, 673 (Miss. 1973).

¶46. Here, this last factor, moral fitness, is at issue. In addition to finding a material change in circumstances, the chancellor must have found a clear showing that Irle's alleged immoral behavior was so grievous that it presented a legitimate and significant danger to Britney or was actually harmful to her. *Rodgers*, 274 So. 2d at 673; Deborah H. Bell, *Bell on Mississippi Family Law* § 12.06 (3)(a) at 371 (2d ed. 2011) (providing that to award custody to a grandparent over a natural parent based on moral unfitness, "a court must find [by clear evidence] that [the] parent engaged in conduct presenting a genuine serious danger to [the] child."). A review of the chancellor's ruling shows that he found Irle morally unfit; however, substantial credible evidence does not support such a finding. *See Rodgers*, 274 So. 2d at 673.

¶47. The chancellor's ruling on Irle's moral fitness relied heavily on her alleged drug use and overnight visits with Gary Volyes, as well as the fact that Irle had four children out of wedlock. Because all of Irle's children were born prior to February 2011, the trial court clearly erred in considering this fact.

¶48. The chancellor likewise erred in concluding that Irle's overnight visits constituted a lack of moral fitness. Here, there was undisputed testimony that Irle and Britney spent the night at Voyles's house on six different occasions. Irle and Voyles both testified that Irle slept on the couch, Voyles slept in his bedroom, and Britney slept in another bedroom. Irle and Voyles also testified that there was no sexual involvement between the two. When

19

asked about Voyles, Britney testified that she liked him and liked the fact her mother was in a relationship with him.

¶49. Even giving deference to the chancellor's interpretation of the facts, as we must do, this evidence is legally insufficient to support a finding of moral unfitness. This Court has noted that an overnight stay with a member of the opposite sex to whom the parent is not married does not constitute immoral behavior requiring modification of child custody. *See Robinson v. Robinson*, 722 So. 2d 601, 605 (Miss. 1998); *Harrington v. Harrington*, 648 So. 2d 543, 547 (Miss. 1994); *Dunn v. Dunn,* 609 So. 2d 1277, 1286 (Miss. 1992). There must also be objective proof that the overnight visitation is detrimental to the child. *See Harrington*, 648 So. 2d at 547; *Dunn,* 609 So. 2d at 1286. Here, there was no evidence that Irle's overnight visits with Voyles were harmful to Britney.

¶50. Regarding Irle's alleged drug use, the only objective evidence that Irle had used drugs after February 18, 2011, was a failed drug test administered by the guardian ad litem (GAL) in October 2011. Irle claims the result was a false positive, and she took another drug test the following day, which she passed. While the testimony indicated that Irle had used illegal drugs in the past, with the exception of the one failed drug test,[20] there was little evidence of a current drug problem.

¶51. Because the Fosters failed to put on clear evidence rebutting the natural-parent presumption, the chancellor erred in finding Irle morally unfit and stripping her of that

---

[20] Irle actually failed two drug tests administered by the GAL, but they were both administered on the same day. The GAL gave the second test immediately after the first because Irle claimed it was false positive. Irle passed a drug test the next day.

20

presumption. As this Court has stressed previously, parents are entitled to a strong presumption that it is in a child's best interest for a natural parent to retain custody. ***Grant***, 757 So. 2d at 266. The chancellor relied on either legally insufficient or unsubstantiated evidence to rebut this presumption. Therefore, I would reverse and remand this matter to the trial court for further proceedings consistent with this opinion.

**KING, J., JOINS THIS OPINION.**